FRANCISCO DIMARTINO *v.* MARK RICHENS ET AL.
(SC 16818)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued January 6—officially released May 27, 2003

*Margaret Q. Chapple,* assistant attorney general, with whom were *Eleanor M. Mullen,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, for the appellants (defendants).

*Marc P. Mercier,* for the appellee (plaintiff).

*Opinion*

BORDEN, J. The defendants, Mark Richens, Kenneth J. Robert, Robert Carterud and the department of transportation of the state of Connecticut (department), appeal[1] from the judgment of the trial court rendered for the plaintiff, Francisco DiMartino, on: (1) a jury verdict in favor of the plaintiff for the alleged violation of 42 U.S.C. § 1983,[2] concerning his rights to freedom of speech and equal protection of the laws, as guaranteed by the first and fourteenth amendments to the United States constitution; and (2) the trial court's findings that the defendants had violated General Statutes § 31-51q,[3] providing that an employer will be liable for

[1] The defendants appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[3] General Statutes § 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship

discipline or discharge of an employee on account of the employee's exercise of certain constitutional rights. On appeal, the defendants claim that: (1) the plaintiff failed to establish a violation of his right to freedom of speech under the first amendment; (2) there was insufficient evidence to support the jury's finding that the plaintiff's right to equal protection was violated; (3) the court improperly found that the defendants were not entitled to qualified immunity; and (4) the jury's award of punitive damages against Robert was both unsupported by evidence and inconsistent with its determination that he was not liable for compensatory damages.[4] We disagree with the defendants' claims and, accordingly, we affirm the judgment of the trial court.

The plaintiff is a former employee of the department whom the defendants had transferred and demoted after he had cooperated with the state police in a criminal investigation of several fellow employees, including Carterud. The plaintiff brought this action under 42 U.S.C. § 1983 and § 31-51q, alleging that the defendants,

---

between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

[4] The defendants also claim on appeal that the trial court improperly failed to make a necessary subordinate finding when it determined that the department had violated § 31-51q. We do not address this claim because it is not justiciable. "Justiciability requires [inter alia] . . . that the determination of the controversy will result in practical relief to the complainant." (Citations omitted.) *State* v. *Nardini*, 187 Conn. 109, 111–12, 445 A.2d 304 (1982). All of the damages, costs and attorney's fees awarded in the trial court judgment at issue in this appeal were awarded pursuant to 42 U.S.C. § 1983. Although the court found the "issues for the plaintiff" on the count of the complaint alleging a violation of § 31-51q, the court made no award of damages pursuant to that finding. Thus, even if the court's findings under § 31-51q were improper, we could not provide any practical relief for the department, which was the only defendant implicated in that count.

acting under color of state law,[5] had deprived him of his constitutional rights to freedom of speech and equal protection of the laws, as guaranteed by the first and fourteenth amendments to the United States constitution. The defendants denied these allegations, and the action proceeded to trial. The claims under 42 U.S.C. § 1983 were tried to the jury,[6] and the claim under § 31-51q was tried to the court. The jury returned a verdict in favor of the plaintiff under 42 U.S.C. § 1983 and the trial court rendered judgment on the verdict. The court further found for the plaintiff under § 31-51q. This appeal followed.

The jury reasonably could have found the following facts. Prior to the events giving rise to this action, the plaintiff had been employed as a carpentry supervisor at Bradley International Airport (airport), a state-owned and operated facility. In late 1997, the plaintiff was relocated to a new office within terminal B of the airport. The plaintiff's new office abutted a public area of terminal B, including a baggage claim and a men's bathroom. The office was separated from that public area by a single locked door, through which the plaintiff, and only the plaintiff, was authorized to enter his office. The opposite side of the plaintiff's office abutted a workshop that led to a high security area of the airport, known as the "airport operations area" (operations

---

[5] The defendants do not dispute that their alleged conduct in this action was under color of state law. See *Ex parte Virginia*, 100 U.S. 339, 347, 25 L. Ed. 676 (1879) (fourteenth amendment applies to any state agent exerting power of state). "Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition [of the fourteenth amendment]; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning." Id.

[6] As we explain later in this opinion, however, the parties agreed that the question of the protected status of the plaintiff's speech was committed to the trial court.

area). A single door, which could be opened from inside the office without a key, was all that separated the plaintiff's office from the workshop and the operations area. In other words, if someone gained access to the plaintiff's office through the external door from the public area, that person could pass freely through another door to the workshop and the operations area.

The operations area is a location where commercial airline jets refuel and load and unload baggage for national and international flights. This is a highly secured area of the airport because commercial airline jets are vulnerable targets for acts of terrorism. All employees authorized to work in or around the operations area, including the plaintiff, received specialized security training and were regularly tested in security protocol. The employees who worked in the operations area were responsible for observing the grounds and reporting the presence of any suspicious packages or persons. In addition, employees were required to prevent other persons from following them through secured doors. Federal Aviation Administration agents and plainclothes police officers posing as unauthorized persons would test the employees' compliance with these security rules by attempting to follow employees through secured doors or loitering about the operations area, and observing the employees' reactions. These security measures reflected the importance of maintaining a high level of security in the operations area of the airport, so as to ensure that no malfeasance would place a flight at risk.[7]

---

[7] Even prior to the events of September 11, 2001, the notion that commercial airliners were vulnerable to acts of terrorism was a matter of common sense. "[J]uries are not required to leave common sense at the courtroom door." *State* v. *Maxwell*, 29 Conn. App. 704, 710, 618 A.2d 43 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287, cert. denied, 509 U.S. 930, 113 S. Ct. 3057, 125 L. Ed. 2d 740 (1993), citing *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985). "Jurors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the

The security concerns related to the plaintiff's new office did not end with its location, namely, between both a public area and the highly secure operations area. In addition, the plaintiff's office housed a key bank containing dozens of duplicate keys, which, if taken, would allow access to several secure areas of the airport. These areas included the airport personnel offices, the security offices and the operations area. Unauthorized use of these keys would have posed serious risks both to airport security and public safety. The airport security division promulgated strict rules governing key issuance and access to the key bank; the security division did not consider compliance with these rules to be optional. The plaintiff was responsible for maintaining the integrity of the key bank and he was not authorized unilaterally to issue a key to an unauthorized person, or to ignore another person's unauthorized removal of keys from the key bank. Rather, he was authorized to issue a key from the key bank only when directed to do so by Lisa Fazzino, an officer from the airport's security division. Before any key would be issued, it had to be encoded and labeled, and a record had to be made of the recipient and the areas to which he or she would be permitted access so that access to secure areas of the airport could be monitored and controlled.

In summary, controlling access to the plaintiff's office was critical to airport security and general public safety for two major reasons. First, the plaintiff's office was a potential conduit from a public area of the airport, near the baggage claim of terminal B, to a highly secure area of the airport, the operations area, where commercial airliners refueled and loaded and unloaded baggage. Second, the plaintiff's office contained the key bank,

end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Little*, 194 Conn. 665, 674, 485 A.2d 913 (1984).

which held several high security keys to restricted areas of the airport, including personnel offices, the main security office and the operations area.

The plaintiff was the only person who was issued a key to his office. If another employee needed a key from the key bank, the proper procedure was to contact the plaintiff, who would then consult Fazzino, who would then determine whether to issue such a key through the plaintiff. The proper procedure was not, by contrast, for someone, even another employee, simply to enter the plaintiff's office and open the key bank.

Soon after moving into his new office, the plaintiff suspected that someone had been entering his office, because certain items were out of order or missing. The plaintiff examined the two doors to his office and noticed marks near the handles and latches of the doors and along the doorjambs. This indicated to the plaintiff, a skilled carpentry supervisor, that someone might have gained entry to the office by prying the doors open. The plaintiff reinforced the doors with striker plates in order to prevent anyone from prying the doors open again. In addition, the plaintiff painted over the existing pry marks in order to determine whether someone was currently attempting to gain entry to the office forcibly.[8]

Within two weeks of taking these measures, the plaintiff noticed fresh pry marks on both of the doors to his office. The plaintiff was unsure, however, whether anyone had gained entry into his office. In order to determine whether someone was, in fact, breaking into his office, and, if so, to determine which of the doors was being opened, the plaintiff began to set objects

[8] The plaintiff realized that someone might have pried the doors open long before he had arrived, perhaps for legitimate reasons. Repainting the doorways was an effective means for determining whether someone had been prying the doors open since he had arrived because a fresh coat of paint would be marred by, and thus reveal, a successive effort to pry the doors open.

against the doors when he locked up and left his office. He would set these objects in such a way that they would fall if someone opened the doors, but would remain undisturbed if someone merely tried the doorknobs or shook the doors.

The objects placed against the doors remained undisturbed for several weeks. On Friday evening, December 5, 1997, the plaintiff locked his office and placed the objects against the doors, in accordance with his usual routine. When the plaintiff returned to his office on the following Monday, he noticed that the plastic object that he had placed on the hinge of one of the doors had fallen off, indicating that someone had broken into his office over the weekend. The plaintiff immediately noticed new pry marks on the door, the wall and the doorjamb, which had been torn away from the door. Upon entering his office, the plaintiff checked the other door, leading to the operations area, and noticed that the metal object that he had placed against that door had fallen, indicating that someone had breached that door as well.

The plaintiff was extremely concerned about the airport's security. This was because both the key bank and the operations area, where flights were vulnerable to attack or sabotage while loading, unloading and fueling, had been breached by the person or persons who had broken into his office.

The marks that the plaintiff previously had noticed on the other side of the door to the operations area indicated to the plaintiff that an inside employee might be responsible. Not knowing whom to trust, the plaintiff chose not report the incident to Carterud and Richens, who were his immediate supervisors. Instead, the plaintiff reported the incident directly to Robert, who then held the title of airport administrator, which was the highest managerial position at the airport. As he testi-

fied, the plaintiff was extremely concerned about "the possibility of an . . . employee of the state or someone [else] . . . coming through the secured area." Thus, he "made the decision to go right to . . . Robert." The plaintiff arranged a meeting with Robert and reported the incident to him, relating his concerns about the airport's security. As the plaintiff testified: "[My] concerns were that if somebody was breaking into my office and if it was somebody from the public area who did not work at the airport, they could very easily come into the office and have access out onto the [operations area] which is a highly secured area. [Such a person could] [a]lso possibly grab some keys to doors around the airport and my concern was [that] . . . it was somebody who worked on the airport premises maybe coming in and tampering with my door and getting into the area and possibly getting some keys." Robert took the plaintiff's statement seriously, and shared his concerns about airport security. Robert went to the plaintiff's office and examined its condition, noting that the pry marks on the doors corroborated the plaintiff's statement. Robert then asked the plaintiff to assist him in reporting the incident to the state police, to which the plaintiff agreed.

The state police maintained a station at the airport, in the same building as the plaintiff's office. The plaintiff and Robert went to the station and reported the incident to Sergeant Brian Kennedy. The plaintiff gave substantially the same statement to the police that he had given to Robert. An officer then accompanied the plaintiff and Robert to the plaintiff's office to investigate. After corroborating the physical signs of the break-in, they returned to the station, where the plaintiff signed a written statement describing the factual circumstances of the incident.

The police decided that the next logical step would be video surveillance of the plaintiff's office. Robert

agreed, and told the plaintiff to cooperate with the state police in every way to aid in their investigation.

The police installed a hidden video camera in the plaintiff's office. Each day, they replaced and reviewed a twenty-four hour videotape to determine whether it revealed any activity. The police instructed the plaintiff to tell no one about the investigation, explaining that there would be a greater risk that the person or persons responsible would learn of the investigation, and avoid future detection and responsibility for their acts.

For several weeks, the video surveillance revealed no activity in the plaintiff's office. In late January, 1998, the plaintiff took several days of sick leave to recover from a medical procedure. Before leaving, the plaintiff surrendered one of the keys to his office to Carterud, in order to allow access to the key bank in the event that the security division were to authorize the issuance of a key to an employee.

The video surveillance revealed unusual activity in the plaintiff's office during his leave of absence. People were entering the plaintiff's office with paper bags and searching his desk, his file cabinet and the key bank. As they searched the plaintiff's belongings and the key bank, these people removed several items, placing them in the paper bags. The police attempted to contact the plaintiff, but learned that he was away on sick leave. Upon his return, the police asked the plaintiff to view a videotape of the activity in his office and to identify any person that he recognized. The police also asked the plaintiff to explain, if he could, why the people depicted on the tape were engaged in the activities displayed. The plaintiff recognized all of the persons entering his office as his fellow employees, including Carterud, but the plaintiff was unable fully to explain what they were doing, or why. The plaintiff did offer the suggestion that they might have been removing sup-

plies, but indicated that the proper procedure for obtaining supplies was to submit a "stores requisition," and that his office did not contain supplies for general use. Moreover, the plaintiff stated that the only reason someone would need to gain access to his office would be to obtain a key from the key bank, at the direction of the security division. This was the sole reason that the plaintiff had given his key to Carterud. Some of the employees' activities could not be explained as removing supplies or obtaining keys. For example, one of the employees who searched the plaintiff's desk was a union representative, who had no need to obtain construction supplies.

The police asked the plaintiff to examine his office. Upon entering, the plaintiff immediately noticed that someone had "gone through" his entire office, including the key bank. The key bank had been left unlocked by the person or persons who had entered it. The police asked the plaintiff to sign another written statement, containing each of these facts, and the plaintiff complied. In that statement, the plaintiff stressed his concerns about maintaining the security of the key bank, to safeguard airport security.

The police acted quickly on the information and located each of the persons identified on the videotape and questioned them about their activities in the plaintiff's office. The police questioned Carterud at his home on Sunday. Carterud was angered by the encounter. Carterud directed his anger at the plaintiff, and speculated that the plaintiff had been "setting [him] up . . . ." When Richens learned of Carterud's anger toward the plaintiff, he became angered as well because he was "left out of the loop" and surprised by the investigation. Richens and Carterud soon met and planned to take action against the plaintiff.

Richens and Carterud then spoke with Robert and obtained his direct authorization to terminate all of the

plaintiff's supervisory powers and responsibilities. In a letter formalizing that action, the defendants stated that there was a high risk of confrontations between the plaintiff and angered workers, necessitating the termination of the plaintiff's supervisory powers over them, and his removal from their vicinity. The defendants explained to the plaintiff that the term "confrontations," as used in the letter, was a euphemism for physical violence, which, they stated, was likely if the plaintiff were allowed to remain in his supervisory position. In a subsequent letter explaining the transfer to the personnel division of the department, Richens reiterated their view that the plaintiff's continued presence "could lead to . . . violence . . . ."

The defendants removed all of the plaintiff's powers, privileges and responsibilities. They confiscated all of his equipment, tools and supplies, including his truck, telephone and keys to various areas of the airport. The defendants terminated the plaintiff's budget for administering projects, and ordered the supply shop to refuse to honor any of the plaintiff's requests for supplies. For two months after the defendants' actions, the plaintiff essentially had no job responsibilities whatsoever, and he was left to wander the airport aimlessly. Despite the defendants' purported concern for violence flowing from contact with employees in the area, the defendants did not change the plaintiff's work location. Thus, the plaintiff continued to be in regular contact with angry, and potentially violent employees. Additionally, the plaintiff endured degradation at the hands of other employees, who laughed or smirked at him in passing.

After this two month period, Robert reassigned the plaintiff to assist a handyman. Robert asked the plaintiff if he would accept such a reassignment. When the plaintiff refused, Robert nonetheless transferred him to assist the handyman. In this capacity, the plaintiff traveled between other, smaller airports owned by the state

and performed menial, odd jobs, unbefitting his official designation as a supervisor. Robert placed the plaintiff "under the direct supervision of [the handyman]," and ordered the plaintiff to "report each work day at your regular hours to [the handyman] . . . . You will share [his] office," which was located in the same building as the plaintiff's prior workplace. As a result, the plaintiff continued to have contact with the purportedly violent employees, who continued to harass him. The defendants made no effort to monitor or control this contact and behavior. Initially, the plaintiff had a telephone in his office, which he used to assist the handyman by making telephone calls to arrange work. Within a few weeks, however, a telephone repairman informed the plaintiff that his telephone and voice messaging were to be removed immediately, under the order of an unidentified authority figure.[9]

The menial jobs in which the plaintiff assisted were so trivial that personnel at the remote airports found his presence confusing, and frequently asked the plaintiff embarrassing questions, such as: "[W]hat did you do to deserve to be out here with [the handyman]." The area personnel found the plaintiff's presence to be confusing because there was insufficient work for the handyman alone, and neither the handyman nor the plaintiff was provided with a budget to undertake more projects.[10] In one episode, the plaintiff and the handyman were asked to replace light bulbs at one of the small, remote airports, but because they had no budget to purchase replacement bulbs, they resorted to walking around the airport and asking various employees whether they could take light bulbs that were in use. The plaintiff continued to complain to Robert about the transfer and

---

[9] When pressed for an explanation as to why the state was removing his telephone, the repairman replied: "Frank, I am just doing what I am told."

[10] As a result, personnel at the small, remote airports often assumed that the plaintiff was sent to administer a new budget.

the nature of his work with the handyman, but Robert was unresponsive.

Ultimately, Richens and Carterud decided to transfer the plaintiff back to the airport after discovering that there was insufficient funding for the assistant handyman job. The defendants[11] did not, however, restore the plaintiff to his position as a supervisor. Instead, the defendants placed the plaintiff under the direct supervision of the building superintendent (superintendent), who, among other things, was in charge of the janitorial and housekeeping services for the airport. As the defendants were aware, the superintendent harbored a long-standing personal conflict with the plaintiff.[12] Nonetheless, the defendants asserted that the placement would serve to *prevent* conflict, based on their previous rationale that the plaintiff's supervisory authority would not be tolerated by certain potentially violent employees. The plaintiff asked to be protected from the potentially violent employees, or at least to be made aware of who they were so that he could protect himself. The defendants refused, explaining that if something happened, they would deal with it later. Richens also explicitly ordered the superintendent to evaluate the plaintiff's job performance in order to determine his future "service rating" with the department. The plaintiff still rightfully held the title of carpentry supervisor, a position at least equivalent in rank to that of the superintendent, which made supervision by the superintendent improper. Tensions were increased when the

[11] By this time, Robert had been transferred to a different position. Therefore, for convenience, from this point in time forward in the recitation of the facts we refer to Richens and Carterud as the defendants.

[12] The plaintiff and the superintendent had clashed previously when the superintendent had begun ordering the plaintiff to perform his carpentry work differently and attempted to begin supervising the plaintiff's employees in their work. Because the plaintiff was the carpentry supervisor, and the superintendent was not in command of the carpentry unit, the plaintiff told the superintendent to cease attempting to take over those responsibilities.

defendants assigned the plaintiff to work in a cramped office with the superintendent. The plaintiff's desk was wedged in front of the aisle facing the door to the office. The layout of the office made any entrance into the office "complicated," and the superintendent often needed to meet with supplier's representatives in the office.

The superintendent complained to the defendants regularly about the plaintiff's inconvenient location in his office. No one had ever been placed within the superintendent's office before and, based on the limited space, the placement was inappropriate. After one month of frequent complaints, the defendants relented, and moved the plaintiff's workplace into a storage closet, filled with carts, supplies and garbage, which was piled onto the floor. The storage closet was located off of the carpenter's workshop—the very workshop that held the ostensibly hostile employees that the defendants had claimed should not be in contact with the plaintiff. The plaintiff was forced, due to the configuration of the office and the key access he was given, to access his office by exiting the building and reentering through the workshop, resulting in frequent contact with the hostile employees. The plaintiff objected to this relocation, but the superintendent stated that he had no ability to prevent it because "[a] decision was made and that is where [he] was going to go."

After numerous requests, the superintendent finally managed to procure for the plaintiff a key to an inside corridor leading to the supply closet where he was working. Despite the convenience that the key would supply, the plaintiff refused to accept it, because the key was stamped with the following code: "ASS 1." Based on the encoding system, this stamp was not a proper code. When the superintendent and the plaintiff

complained to Carterud, he laughed at them, and offered an unlikely explanation.[13]

The plaintiff's duties changed under the supervision of the superintendent. The superintendent placed the plaintiff in charge of hand delivering toilet paper to all areas of the airport, including locations where the plaintiff's purportedly hostile former employees might be located, and might be prone to continue to humiliate him. The delivery duties assigned to the plaintiff had been assigned previously only to inmates from Somers correctional institution, whom the airport employed while they remained in custody for criminal convictions.

Despite the turbulent history of the relationship between the superintendent and the plaintiff, the superintendent experienced a crisis of conscience concerning the plaintiff's treatment at the hands of the defendants. After their first meeting following the reassignment, the superintendent took the plaintiff aside and explained the circumstances to him. The superintendent told the plaintiff that the defendants had confessed to him that they sought to "get rid of" the plaintiff and that they thought that, based on the superintendent's personal conflict with the plaintiff, the superintendent would be the ideal person to degrade and goad the plaintiff, causing him to lose control and react adversely to his working conditions, thereby manufacturing cause to terminate him. The superintendent did not approve of the defendants' actions and stressed to the plaintiff that he had "no part in [it] . . . ." The

[13] Carterud stated that "ASS" innocently stood for "Airport Storage Shop." The plaintiff was familiar with the proper encoding system because he previously had been in charge of handling keys for the airport. When the plaintiff suggested that they talk to Fazzino, the security division person in charge of issuing keys, to corroborate the innocent explanation, Carterud replied: "Fuck Lisa Fazzino," and admitted that she had no knowledge of the key.

plaintiff asked the superintendent to repeat the defendants' confession to a union representative, and the superintendent did so.

Again, the plaintiff vigorously objected to reassignment, but the defendants took no action to restore his privileges and responsibilities as a carpentry supervisor. Finally, the plaintiff resorted to filing grievances with the union to challenge his involuntary transfers. The grievances were sustained in short opinions[14] and the defendants were ordered to reinstate the plaintiff's privileges and responsibilities as a carpentry supervisor.

Throughout the entire relevant period, the defendants took no action legitimately to alter the plaintiff's official designation as a carpentry supervisor, because such action would have required formalized reasoning based upon an evaluation of the plaintiff's abilities as a supervisor. The plaintiff's written performance evaluations as a supervisor, authored *by the defendants*, were consistently superlative. The authors of the grievance opinions determined that the defendants "essentially gut[ted]" the plaintiff's job without justification, whatever the title he still officially held. Even in the face of authoritative orders from the state labor commissioner to restore the plaintiff to his official position, however, the defendants continued to refuse to do so.

The defendants continued to take no action to address the asserted potential violence of the other employees, despite requests by the plaintiff, and despite the defendants' assertion that potential violence was the primary concern motivating their actions against

---

[14] The plaintiff's ultimate assignment to work for the superintendent, with no further supervisory authority, was determined to violate article 15 of the applicable union contract because the plaintiff's "job classification [had], as its core, supervisory responsibilities." The hearing officer found that the "remov[al] [of] this portion of the [plaintiff's] duties essentially guts the job."

the plaintiff. As a result of the defendants' actions, the plaintiff suffered from severe anxiety, depression and associated physical symptoms, requiring medical therapy from psychiatric professionals. The plaintiff suffered from heart disease and his cardiologist was extremely concerned about the impact of the severe stress he was being subjected to in the workplace. Ultimately, the plaintiff's hollow victory in the union grievances overcast his plans to resume his rightful position and the plaintiff filed for early retirement, suffering financial penalties as a result.

The plaintiff then filed this action for damages under § 31-51q and 42 U.S.C. § 1983, alleging that the defendants, acting under color of law, had deprived him of his rights to freedom of speech and equal protection. See footnotes 2 and 3 of this opinion for the text of 42 U.S.C. § 1983 and § 31-51q. At the close of all the evidence, the defendants moved for a directed verdict in their favor and the trial court denied that motion in an oral ruling.

Prior to the jury's deliberations, the plaintiff moved to have all of the factual issues related to the § 31-51q count resolved by the jury, rather than by the court. The trial court orally denied that motion, indicating that it would decide the issues involved in the § 31-51q count.[15] The plaintiff also moved for the court to determine the protected status of the plaintiff's speech under the first amendment. The defendants did not object, and the court granted that motion "consistent with the agreement of the parties." The court later determined that the plaintiff's speech was protected. Although the court found the issues related to the § 31-51q count "for the plaintiff," the court did not make any award of damages, costs or attorney's fees under that count. See footnote 4 of this opinion.

---

[15] That ruling is not before us in this appeal.

The remaining factual issues related to the 42 U.S.C. § 1983 counts, and the amount of damages under those counts were submitted to the jury. The jury returned a verdict in favor of the plaintiff in the amount of $300,000 in general and punitive damages, and $125,009 in attorney's fees and costs. The $300,000 in damages was composed of $150,000 in general damages against Carterud and Richens, and $150,000 in punitive damages against Carterud, Richens and Robert. The jury answered specific interrogatories[16] in connection with the verdict,

---

[16] The jury's responses to the specific interrogatories may be summarized as follows:

I. VIOLATION OF 42 U.S.C. § 1983, FIRST AMENDMENT

1. The plaintiff's speech was motivated by matters of both public and personal concern.

2. The defendants proved by a fair preponderance of the evidence that they reasonably believed that the plaintiff's speech was or was likely to be disruptive of the operation of the airport.

3. The plaintiff proved by a fair preponderance of the evidence that the plaintiff's speech, and not the actual or likely disruption, was a substantial motivating factor in the defendants treatment of the plaintiff.

4. Richens and Carterud, but not Robert, were substantially motivated by the plaintiff's speech.

5. The defendants acted with malicious intent to violate the plaintiff's rights or unlawfully injure him or with a callous or reckless disregard of his rights.

6. Richens and Carterud, but not Robert, were so motivated.

II. VIOLATION OF 42 U.S.C. § 1983, EQUAL PROTECTION

7. Each of the defendants violated the plaintiff's right to equal protection of the laws by subjecting him to treatment different than other similarly situated department employees.

8. In subjecting the plaintiff to such treatment, each of the defendants acted with malicious intent to violate the plaintiff's rights or unlawfully injure him or with a callous or reckless disregard of his rights.

9. Richens, Carterud and Robert were so motivated.

III. TOTAL AWARD

10. Fair, just and reasonable compensatory damages:

A. $75,000 against Richens.

B. $75,000 against Carterud.

C. $0 against Robert.

Total award: $150,000 in compensatory damages.

11. Punitive Damages:

A. $50,000 against Richens.

B. $50,000 against Carterud.

including issues related to the protected status of the plaintiff's speech. The interrogatories had been drafted prior to the court's ruling that it would determine whether the plaintiff's speech was protected under the first amendment. The jury determined that Richens and Carterud had been motivated substantially by the plaintiff's speech on a matter of public concern when they took action against the plaintiff. The jury also stated, in response to the interrogatories, that each of the individual defendants had violated the plaintiff's right to equal protection based on "a malicious intent to violate the plaintiff's rights or unlawfully injure him or . . . a callous or reckless disregard of his rights."

The defendants moved for remittitur and to set aside the verdict, on essentially the same grounds raised in their motion for a directed verdict. The trial court denied those motions and rendered judgment in favor of the plaintiff on: (1) the 42 U.S.C. § 1983 count, in conformity with the jury verdict and interrogatories; and (2) the § 31-51q count.

I

The defendants first claim that the plaintiff failed to establish a violation of his right to freedom of speech under the first amendment to the United States constitution and, therefore, that the trial court improperly failed to render judgment for them. The defendants do not dispute the legal proposition that, as agents of a state government, they may not retaliate against an employee, such as the plaintiff, for exercising his right to freedom of speech under the first amendment. Cf. *Connick* v. *Myers*, 461 U.S. 138, 142, 103 S. Ct. 1684,

---

C. $50,000 against Robert.

Total award: $150,000 in punitive damages.

We note that there is an apparent inconsistency inherent in the jury's failure to award any compensatory damages against Robert, while awarding punitive damages against him. The defendants raise this inconsistency as their final claim in this appeal. See part IV of this opinion.

75 L. Ed. 2d 708 (1983). Rather, the defendants argue that the plaintiff's speech was not protected by the first amendment for two reasons: (1) the plaintiff's speech "cannot be fairly characterized as constituting speech on a matter of public concern"; id., 146; and (2) even if the plaintiff's speech fairly could be characterized as constituting speech on a matter of public concern, their legitimate employment interest in taking action against the plaintiff in reaction to his speech outweighed the first amendment interest in his speech. See *Pickering* v. *Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). We address these arguments in turn.

Before addressing these arguments, however, we set forth the applicable standard of review. Ordinarily, a jury or trial court's findings of fact are not to be overturned on appeal unless they are clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 70, 699 A.2d 101 (1997). Thus, we ordinarily review the findings of fact made by the jury, in its verdict and specific interrogatories, and by the trial court in its judgment, for clear error.

In certain first amendment contexts, however, appellate courts are bound to apply a de novo standard of review. For example, in the context of government employee speech, such as the present case, the "inquiry into the protected status of . . . [that] speech is one of law, not fact." *Connick* v. *Myers*, supra, 461 U.S. 148 n.7. As such, an appellate court is "compelled to examine for [itself] the [government employee's] statements in issue and the circumstances under which they

[are] made to see whether or not they . . . are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." (Internal quotation marks omitted.) Id., 150 n.10. "[I]n cases raising First Amendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' *New York Times Co.* v. *Sullivan,* [376 U.S. 254, 284–86, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)]. See also *NAACP* v. *Claiborne Hardware Co.,* 458 U.S. 886, 933–934 [102 S. Ct. 3409, 73 L. Ed. 2d 1215] (1982); *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U.S. 6, 11 [90 S. Ct. 1537, 26 L. Ed. 2d 6] (1970); *St. Amant* v. *Thompson,* 390 U.S. 727, 732–733 [88 S. Ct. 1323, 20 L. Ed. 2d 262] (1968)." *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984); see also *Connick* v. *Myers,* supra, 150 n.10. This rule of "independent review" was forged in recognition that a "[c]ourt's duty is not limited to the elaboration of constitutional principles . . . [rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied." (Internal quotation marks omitted.) *Bose Corp.* v. *Consumers Union of United States, Inc.,* supra, 508. Therefore, even though, ordinarily, under both Practice Book § 60-5 and rule 52 (a) of the Federal Rules of Civil Procedure, "[f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to make a fresh examination of crucial facts" under the rule of independent review. (Internal quotation marks omitted.) *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.,* 515 U.S. 557, 567, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995).

This rule of independent review has been applied by the United States Supreme Court in other first amendment contexts, aside from government employee speech. See, e.g., *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 1038–39, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) (attorney discipline for speech); *Bose Corp.* v. *Consumers Union of United States, Inc.*, supra, 466 U.S. 510–11 (" 'actual malice' " in libel action); *Miller* v. *California*, 413 U.S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973) (obscenity). Furthermore, since *Connick*, the Supreme Court has maintained the rule of independent review in the specific first amendment context of government employee speech. See *Rankin* v. *McPherson*, 483 U.S. 378, 385–86, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987). Accordingly, the federal Circuit Courts, including the Second Circuit Court of Appeals,[17] have followed the rule. See, e.g., *Metropolitan Opera Assn.* v. *Local 100 Hotel Employees & Restaurant Employees International Union*, 239 F.3d 172 (2d Cir. 2001); *Commodity Trend Service, Inc.* v. *Commodity Futures Trading Commission*, 149 F.3d 679, 686 (7th Cir. 1998); *United States* v. *Cutler*, 58 F.3d 825, 834 (2d Cir. 1995); *Contemporary Mission, Inc.* v. *New York Times Co.*, 842 F.2d 612, 622 (2d Cir. 1988); *Tavoulareas* v. *Piro*, 763 F.2d 1472, 1479–80 (D.C. Cir. 1985).

We note that in *Brown* v. *K.N.D. Corp.*, 205 Conn. 8, 14, 529 A.2d 1292 (1987), we determined that the independent review standard did not apply where "no penalty [had been] imposed for the exercise of first amendment rights . . . ." We reasoned that "an appellate court should have no authority under the guise of independent review to upset [such a] determination." Id. *Brown* involved a claim of "actual malice" in a libel action, not a claim by a government employee that he

---

[17] "Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive." *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000).

had been retaliated against for his speech. Id., 9. To the extent, however, that *Brown* may conflict with the independent review of a trial court's findings regarding the protected status of a government employee's speech, mandated by *Connick* v. *Myers*, supra, 461 U.S. 150 n.10, we decline to follow it. The court in *Connick* determined that independent review is mandatory, without exception, in all appeals challenging a trial court's finding as to the protected status of government employee speech. Id. Thus, we must engage in a de novo review of the trial court's findings under § 31-51q and 42 U.S.C. § 1983, and the jury's findings under 42 U.S.C. § 1983, that the plaintiff's speech was protected by the first amendment.

A

First, the defendants claim that the trial court should have determined that the plaintiff's speech fairly could not be characterized as constituting speech on a matter of public concern, which is a prerequisite to claims by government employees that their rights to free speech have been infringed by their government employers. See id., 142. Specifically, the defendants argue that the plaintiff's speech exclusively addressed the security of his own personal property, namely, his work space and several personal items that he suspected had been taken by someone who had broken into his office.[18] Con-

---

[18] We note that, on appeal, the defendants also argue that, as a matter of law, the plaintiff's speech did not involve a matter of public concern because it was delivered in the course of his duties as an employee. Cf. *Volberg* v. *Pataki*, 917 F. Sup. 909, 916–17 (N.D.N.Y.) (" 'at-will high-level policy-making employee' " speech "in the course of her employment" unprotected under first amendment), aff'd, 112 F.3d 507 (2d Cir. 1996), cert. denied, 520 U.S. 1119, 117 S. Ct. 1252, 137 L. Ed. 2d 333 (1997). As the plaintiff correctly observes, the defendants never raised that legal argument before the trial court. Therefore, we decline to address it. Cf. *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 450–51 n.13, 815 A.2d 119 (2003) ("[O]ur normal practice [is to decide] an appeal on the same basis on which it was tried in the trial court. See *State* v. *Bell*, 188 Conn. 406, 413, 450 A.2d 356 [1982].").

We are cognizant that, as a part of the entire context of the plaintiff's speech, his employment duties are relevant to the question of whether his

versely, the defendants argue that the plaintiff's speech fairly cannot be characterized as involving a concern for general airport security, which they concede would be a matter of public concern. We are not persuaded.

It is by now well established that a state government may not compel individuals to relinquish their first amendment rights as a condition to obtaining government employment. *Harman* v. *New York*, 140 F.3d 111, 117 (2d Cir. 1998); see also *Pickering* v. *Board of Education*, supra, 391 U.S. 568 (court had "unequivocally rejected" that legal proposition in "numerous prior decisions"). The prevailing view during the early 1950s was exactly the reverse. Under that earlier view, government employment was seen as a privilege, rather than a right, and conditions to employment that interfered with employees' freedom of speech generally were held to be constitutional because the employees "are at liberty to retain their beliefs and associations and go elsewhere." *Adler* v. *Board of Education*, 342 U.S. 485, 492, 72 S. Ct. 380, 96 L. Ed. 517 (1952). Justice Holmes advanced that view in an early case written for the Supreme Judicial Court of Massachusetts. See *McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517 (1892) ("[t]he petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman"). With the abandonment of the "rights" and "privileges" distinction as a constitutional

---

speech addressed a matter of public concern. See *Connick* v. *Myers*, supra, 461 U.S. 147–48. In their arguments on their motion for a directed verdict, however, the defendants exclusively argued that the plaintiff was concerned solely about the security of his personal property, and not the security of the airport. We will decide the appeal on that basis. Cf. *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 450–51 n.13. The failure, if any, of the trial court to recognize and apply this unsettled legal principle, unassisted by counsel, is not plain error. "[P]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Boles*, 223 Conn. 535, 551, 613 A.2d 770 (1992).

doctrine, however, the United States Supreme Court discontinued that approach. The court then recognized that "if the government could deny a *benefit* to a person because of his constitutionally protected speech . . . his exercise of those freedoms would in effect be penalized and inhibited." (Emphasis added.) *Perry* v. *Sinderman*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).

In *Pickering* v. *Board of Education*, supra, 391 U.S. 568, however, the court also recognized that a government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." The court then set forth a general principle governing the constitutionality of government restrictions on the speech of its employees: in evaluating the constitutionality of government restrictions on an employee's speech, a court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs . . . ." Id.

In *Connick* v. *Myers*, supra, 461 U.S. 150, the court added a modification to the general "balancing" test promulgated in *Pickering*. Under *Connick*, if a government employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary . . . to scrutinize the reasons for [his or] her discharge." Id., 146. The court reasoned that if an employee's speech addresses matters of exclusively private concern, the government interest in "latitude [to manage] their offices, without intrusive oversight by the judiciary"; id.; would outweigh the first amendment interests in the speech, "absent the most unusual circumstances . . . ." Id., 147.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record." Id., 147–48. An employee's speech addresses a matter of public concern when the speech can "be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." Id., 146.

Our independent review of the record leads us to the conclusion that the plaintiff's speech fairly can be considered to relate to a matter of political and social concern to the community. The record makes clear that, when the plaintiff spoke to the police, he was concerned about the security of the airport because both the key bank and the operations area had become exposed to someone who had broken into his office. After September 11, 2001, when the trial in this case took place, the concept that airport security was a matter of political and social concern to the community could not be seriously questioned. The evidence, including part 107 of the Federal Aviation Regulations,[19] which was distributed to employees at the airport, unequivocally reflects that concern. Commercial flights had been regular targets for acts of terrorism for several decades; the potential impact of a security breach on public safety and national security was a matter of common knowledge.

Indeed, the defendants do not argue that airport security is a matter of exclusively private concern. Instead, the defendants challenge the finding that the plaintiff was motivated by concern for airport security. The gravamen of the defendants' argument is that, in his first written statement to the police, the plaintiff reported, among other things, that personal items were missing

[19] Part 107 of the Federal Aviation Regulations require the approval and implementation of extensive security systems and procedures. These regulations are too voluminous to reproduce in this opinion.

from his office, and he did not explicitly state at that time that he was concerned about airport security. The defendants argue that these factors prove that the plaintiff's concerns were exclusively personal, and did not include any concern for airport security. For several reasons, we find this argument unpersuasive.

First, in the very statement that the defendants cite, the plaintiff *did*, in fact, mention his concerns about the security of the key bank, which held dozens of high security keys, which, if taken, would allow any person who took them access to several secure areas of the airport. These areas included the airport personnel offices, the security offices and the operations area. Unauthorized access to these keys would have posed serious risks both to airport security and public safety. In recognition of these dangers, the airport security division promulgated strict rules governing access to the key bank and key issuance. Second, the statement mentions that both doors had been breached by an intruder: the door to the public area, and the door that led to the highly secure operations area. As discussed previously, maintaining security in the operations area is critical to airport and public safety because commercial jets are located there, and vulnerable to malfeasance as they prepare for flight. Third, in a later statement, the plaintiff explicitly stated his concern for airport safety after realizing that the key bank had been breached by a person who had entered his office.[20] Finally, even if the plaintiff had not stated explicitly his concerns about airport security to the police in that statement, we would not draw the inference suggested by the defendants, namely, that the plaintiff's speech had not been motivated by a concern for airport secu-

---

[20] In his statement to the police on February 7, 1998, the plaintiff stated that, upon returning to his office from sick leave, he observed that "[t]he key bank on the wall had been entered [and was] still unlocked. This bank holds [the] high security keys for the entire airport . . . ."

rity. The police statement in question was handwritten by the police and signed by the plaintiff, as a reduction of essential facts, designed to aid in an investigation. The statement does not appear to serve as a platform for voicing the plaintiff's thesis concerning the importance of the investigation. More persuasive is the plaintiff's testimony as to what his concerns were when he spoke to the police: "[My] concerns were that if somebody was breaking into my office and if it was somebody from the public area who did not work at the airport, they could very easily come into the office and have access out onto the [operations area] which is a highly secured area. [Such a person could] [a]lso possibly grab some keys to doors around the airport and my concern was [that] if it was somebody who worked on the airport premises maybe coming in and tampering with my door and getting into the area and possibly getting some keys." For these reasons, we determine that the speech in question fairly can be considered as relating to a matter of public concern.

B

Next, the defendants claim that, even if the plaintiff's speech fairly could be characterized as constituting speech on a matter of public concern, their legitimate employment interest in taking action against the plaintiff in reaction to his speech outweighed the first amendment interest in his speech. See *Pickering* v. *Board of Education*, supra, 391 U.S. 568. We disagree.

The defendants do not dispute that they were substantially motivated by the plaintiff's speech when they took action against him. Therefore, we proceed under *Pickering* v. *Board of Education*, supra, 391 U.S. 568, to "balance . . . the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs" to

determine whether the plaintiff's speech is protected by the first amendment. *Board of Education* v. *Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) (protected expression must have been " 'substantial' " and " 'motivating' " factor of state action to render that action unconstitutional).

We begin with the first amendment interests associated with the plaintiff's speech. As discussed previously, the plaintiff's speech concerned a breakdown in security at the airport. Someone had pried open a locked door that prevented the public from entering the vulnerable operations area of the airport. Furthermore, someone had broken into the airport key bank, which held dozens of keys to several secure areas of the airport, including the security offices, the airport personnel offices, and the operations area. It is difficult to overestimate the political and social significance of this governmental security failure, particularly in light of the terrorist attacks on September 11, 2001. The first amendment interest in encouraging, rather than suppressing, the plaintiff's speech about this breakdown in airport security is great.

By contrast, the state's interest in "promoting the efficiency of [its] services" by taking action against the plaintiff for his speech about a critical breach of airport security, is minimal. *Pickering* v. *Board of Education*, supra, 391 U.S. 568. The defendants argue that they had an important interest in preventing disruption in the workplace—by demoting and removing the plaintiff—because other employees harbored intense hostility toward the plaintiff as a result of his speech. The record demonstrates, however, that this concern for disruption was pretextual[21] and highly unreasonable, and, there-

---

[21] The jury also specifically found that the potential disruption flowing from the plaintiff's speech was not a substantial motivating factor in the defendants' decision to take action against the plaintiff.

fore, of minimal government interest. First, the defendants took no action to address the purported hostility of the other employees, which was the alleged source of potential disruption. The plaintiff constantly requested the simplest of measures from the defendants to ameliorate that hostility, and his requests were consistently denied. Perhaps the simplest request was for the defendants to inform the ostensibly hostile employees that the plaintiff had cooperated with the police investigation because Robert had commanded him to do so. This could have mitigated the perception that the plaintiff had taken it upon himself to "set up" the employees implicated in the investigation, and reduced the associated hostility. Furthermore, the defendants took no action to counsel or otherwise address any of the supposedly hostile employees about their unreasonable anger toward the plaintiff. The state had promulgated a " 'zero tolerance policy' " for potential violence in the workplace, which included mandatory training and counseling for employees who threaten physical violence. Despite this policy, the defendants did not provide, or even suggest, counseling for the hostile employees. Richens acknowledged that they could have removed *the hostile employees* rather than the plaintiff, yet the defendants simply concluded that *the plaintiff* "ha[d] to" be removed. Also, the plaintiff asked to know which employees were hostile toward him, so that he could avoid them or otherwise protect himself, yet the defendants refused, telling the plaintiff that "if an issue arose [they would] deal with it." As discussed previously, after demoting the plaintiff, the defendants nevertheless reassigned him to areas where he came in frequent contact with these purportedly violent employees. Finally, the plaintiff asked that meetings be held to address and resolve the hostility. The defendants refused each of these requests.

The pretextual, unreasonable nature of the defendants' concern for disruption or violence is underscored

by the nature of the transfers themselves. First, the plaintiff's reassignments were highly degrading, indicating that the true motive was vengeance—particularly stemming from Carterud due to his individual implication in the investigations.[22] Furthermore, the issuance of a key to the plaintiff labeled "ASS 1" supports our determination that Carterud acted out of animus. Second, the plaintiff's reassignments were to locations where hostility and conflict were *more likely* to occur. His placement with the superintendent was especially egregious, considering their history of heated altercations. His eventual placement in a supply closet, as a makeshift office, stationed him within feet of the workplace of employees with whom disruption or violence was alleged to be the concern. As a result, he came in regular contact with those employees after that transfer. If easing hostilities were their concern, the defendants' actions were highly unreasonable and of little value.

## II

Next, the defendants claim that there was insufficient evidence to support the jury's determination that the plaintiff's right to equal protection had been violated. Specifically, the defendants contend that the "jury's finding [concerning the equal protection counts] is clearly erroneous because the record contains no evidence regarding similarly situated employees, a necessary element to proving an equal protection claim." We disagree.

---

[22] Carterud testified that he felt violated by the police investigation into his unexplained entry into the plaintiff's office and the key bank. He was particularly angered when the police arrived at his house on a Sunday and interrogated him in his kitchen. He stated, "I don't think [the police] should have been walking around my house and maybe I am wrong . . . but that was probably what upset me . . . ." Carterud also explained that his anger stemmed from the thought that the plaintiff had been "setting [him] up . . . ."

To establish a violation of the equal protection clause of the fourteenth amendment to the United States constitution,[23] the plaintiff must prove that the state discriminated against him based on an impermissible, invidious classification. *Washington* v. *Davis*, 426 U.S. 229, 244–45, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976) (only "purposeful discrimination" violates equal protection clause); *Ferguson* v. *Skrupa*, 372 U.S. 726, 732, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963) ("it is only 'invidious discrimination' which offends the Constitution"); *Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S. Ct. 461, 99 L. Ed. 563 (1955) ("the prohibition of the Equal Protection Clause goes no further than the invidious discrimination"). Therefore, the plaintiff must prove that the action "had a discriminatory effect and that it was motivated by a discriminatory purpose. *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U.S. 256 [99 S. Ct. 2282, 60 L. Ed. 2d 870] (1979); *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 [97 S. Ct. 555, 50 L. Ed. 2d 450] (1977); *Washington* v. *Davis*, [supra, 229]." *Wayte* v. *United States*, 470 U.S. 598, 608–609, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985) (applying equal protection clause to claim that government selectively prosecuted in retaliation for exercise of first amendment right to freedom of speech). Put another way, the plaintiff must establish that he, "compared with others similarly situated, was selectively treated . . . and . . . that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." (Internal quotation marks omitted.) *Schnabel* v. *Tyler*, 230 Conn. 735, 762, 646 A.2d 152 (1994).

---

[23] The equal protection clause of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

As these principles indicate, the defendants are correct in asserting that the plaintiff was required to introduce evidence establishing a discriminatory effect, in addition to a discriminatory purpose. We disagree, however, with the defendants' assertion that the plaintiff has failed to produce such evidence. As stated in part I of this opinion, and as the jury reasonably found; see footnote 16 of this opinion; the permissible government objective claimed by the defendants was pretextual. The impermissible distinction drawn by the defendants in their treatment of the plaintiff was his attempt to exercise his first amendment right to freedom of speech, which is an invidious, unconstitutional distinction to draw. See *Schnabel* v. *Tyler*, supra, 230 Conn. 762 (" 'intent to inhibit or punish the exercise of constitutional rights' " impermissible as government objective). The defendants do not, understandably, point to any evidence that all or most of the airport employees were also subject to the same type of malicious or degrading conduct. Thus, in the absence of any evidence to the contrary, the jury was entitled to draw the reasonable inference that other, similarly situated employees would have been differently treated. Therefore, in the absence of a claim by the defendants that the plaintiff was simply one of many employees against whom they had sought retaliation for his legitimate speech, and in the face of ample evidence that he *had been* so targeted, the jury reasonably could infer that he had been improperly and selectively treated as compared to others similarly situated. As the plaintiff correctly observes, he was not bound to demonstrate invidious discrimination by introducing direct evidence of similarly situated persons who had been treated differently. Rather, a litigant may, and often must, utilize circumstantial evidence to establish the elements of invidious discrimination, which may, in fact, have more probative value. "As this court has stated on numerous occasions, there is no

legal distinction between direct and circumstantial evidence so far as probative [value] is concerned." (Internal quotation marks omitted.) *State* v. *Brown*, 199 Conn. 14, 22, 505 A.2d 690 (1986).

## III

Next, we address the defendants' claim that the trial court improperly found that they were not entitled to qualified immunity in its ruling on their motion for a directed verdict. The defendants argue that "reasonable persons in [their] situation would not have known that the plaintiff's statements were protected by the first amendment," or that their actions against the plaintiff "would violate his first amendment or equal protection rights." More specifically, the defendants argue that because their actions against the plaintiff were motivated by a desire to "quell the turmoil in the workplace," rather than to retaliate against the plaintiff for his speech, and because they did not know that the plaintiff's speech involved airport security, reasonable persons in their position could not have known that their actions were unconstitutional. Thus, the defendants' contentions rest on those two factual premises. We disagree with the defendants' argument.

It is well settled that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier* v. *Navarette*, 434 U.S. 555, 565 [98 S. Ct. 855, 55 L. Ed. 2d 24] (1978); *Wood* v. *Strickland*, [420 U.S. 308, 322, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975)]." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The defendants' factual premises concerning their actions, however, are simply unsupported by the record. First, as discussed previously in this opinion, the jury reasonably found that the defendants demoted and reassigned the plaintiff in

reaction to the exercise of his right to freedom of speech, not out of their desire to prevent disruption in the workplace. See footnote 16 of this opinion and the accompanying text. Second, the record establishes unequivocally that the defendants were each aware of the airport security concerns implicated in the police investigation. Robert reflected those concerns verbally, and Richens and Carterud were each aware of the location of the plaintiff's office relative to the operations area and the public area. Each of the defendants also was aware that the plaintiff's office contained the key bank, holding many high security keys to the airport. Because the defendants' factual premises are flawed, the legal contentions that rest on those premises must fail as well.

## IV

Finally, the defendants argue that the jury's award of punitive damages against Robert was both unsupported by evidence of his "personal involvement" in the action taken against the plaintiff, and inconsistent with the jury's determination that Robert was not liable for compensatory damages. We decline to address these claims because they were not raised before the trial court. See footnote 16 of this opinion.[24]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[24] In their reply brief, the defendants assert that "the issue of the lack of personal involvement of . . . Robert to justify an award of punitive damages was raised [in] the defendants' motion for remittitur, filed on October 29, 2001." The defendants attempt to support this assertion by citing their memorandum of law in support of their motion for remittitur. Upon reviewing the entire memorandum, we find no trace of the claim that Robert was not personally involved in the actions taken against the plaintiff. In that memorandum, the defendants argued that their actions were justified, rather than malicious, because they sought to avoid disruption in the workplace. In fact, in footnote 1 of that memorandum, the defendants argued that "[i]t is clear from the evidence that . . . Carterud played no role in the employment decisions affecting the plaintiff. All the decisions of which the plaintiff complains were taken by either . . . Richens or . . . Robert." (Emphasis added.)