# DOW-WESTBROOK, INC. *v.* CANDLEWOOD EQUINE PRACTICE, LLC
## (AC 29982)

DiPentima, Robinson and Mihalakos, Js.

Argued September 24, 2009—officially released March 9, 2010

*Bernadette M. Keyes*, with whom was *Shari Ann Murphy*, for the appellant (plaintiff).

*Ralph G. Eddy*, with whom, on the brief, was *David A. Estabrook*, for the appellee (defendant).

*Opinion*

MIHALAKOS, J. The plaintiff, Dow-Westbrook, Inc., appeals after a trial to the court, from the judgment in favor of the defendant, Candlewood Equine Practice, LLC (Candlewood Equine), finding that the defendant was not negligent as a result of injuries suffered by the plaintiff's horse, Eiffel Tower, at the defendant's veterinary clinic. On appeal, the plaintiff argues that the court erred by finding (1) in favor of the defendant on the plaintiff's negligence claims in that the finding was against the weight of the evidence, (2) that the parties' hold harmless agreement, signed by the plaintiff, waived liability and (3) that the plaintiff's expert witness was not qualified to testify. We affirm the judgment of the trial court.

The court found the following facts. The plaintiff, a corporation owned by Jane Dow-Burt, owns a riding stable in Westbrook known as the Westbrook Hunt Club. The defendant, a limited liability company owned by Ronald Emond, a veterinarian, operates a veterinary clinic in Bridgewater, specializing in equine reproduction.

In 2001, the plaintiff purchased a mare known as Eiffel Tower for $5000. Dow-Burt testified that she used Eiffel Tower for riding lessons and a few horse shows. Due to a head injury sustained years prior while the horse was being cross-tied, Eiffel Tower had a discernable head tilt. On April 10, 2004, Eiffel Tower was transported from the Westbrook Hunt Club to Candlewood Equine by Darren Tiadore, a horse trainer employed by the plaintiff, and Dow-Burt's husband, Thomas Burt. Thomas Burt testified that he was a retired building contractor and was not knowledgeable about equine matters. Eiffel Tower was to be bred by artificial insemination at the defendant's clinic using frozen semen from the stallion "Rodney."

Upon delivering Eiffel Tower to the defendant, Tiadore had a conversation with Emond regarding Eiffel Tower, the substance of which is disputed by the parties. At trial, Thomas Burt testified that Tiadore specifically told Emond that Eiffel Tower was not to be turned out with other horses.[1] In contrast, Emond testified that Tiadore apologized to him for the horse's appearance, stating that Eiffel Tower was not properly groomed and had just been pulled out of a field with other horses. He also testified that Tiadore told him not to worry about Eiffel Tower's appearance because the plaintiff's intent was that the horse be used as a broodmare.[2] The only additional instructions came from Dow-Burt, who wrote, "careful on crossties she's good, but had an accident—8-10 yrs. ago," on the defendant's boarder agreement, in the section for special handling instructions.

While Eiffel Tower was at Candlewood Equine, the defendant made three attempts to artificially inseminate

[1] The term "turned out" essentially means to move a horse from its stall to an outdoor pasture, usually with other horses.

[2] A broodmare is a female horse that is used for breeding.

her, on April 17, May 25 and July 14, 2004. During this time, Eiffel Tower was turned out with another broodmare, Anna, from April 10 until June 2, 2004, the date it was alleged that Anna kicked Eiffel Tower in the right hind leg, dislocating Eiffel Tower's hock. Eiffel Tower remained at Candlewood Equine until August 5, 2004, when she was brought back to Westbrook Hunt Club. She stayed there until June 28, 2005, when she was sold for $1 as a companion animal.

The plaintiff subsequently filed suit, alleging that the defendant was negligent in turning out the plaintiff's horse with another horse and that the defendant failed to supervise properly and to provide professional care for the horse, constituting a breach of the boarder agreement. The defendant filed a counterclaim seeking indemnification of its attorney's fees, alleging that the plaintiff breached the hold harmless provision of the boarder agreement by filing suit. In the court's memorandum of decision filed May 14, 2008, judgment was rendered in favor of the defendant on the plaintiff's complaint and on the defendant's counterclaim in the amount of $15,000. This appeal followed. Additional facts will be provided as necessary.

I

The plaintiff first claims that the court's judgment in favor of the defendant on the plaintiff's negligence claims was against the weight of the evidence. We disagree.

We begin by setting forth our standard of review. "On appeal, [o]ur function . . . is not to examine the record to see if the trier of fact could have reached a contrary conclusion. . . . Rather, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and

logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Lewis* v. *Frazao Building Corp.*, 115 Conn. App. 324, 329, 972 A.2d 284 (2009).

The plaintiff alleges that the defendant was negligent in turning out Eiffel Tower because a reasonable person would not have done so. According to the plaintiff, Tiadore warned Emond not to turn out Eiffel Tower, and, alternatively, had he failed to warn Emond, the defendant was negligent in turning the horse out without first inquiring about any potential risk. In addition, the plaintiff alleges that the court's judgment was against the weight of the evidence because the defendant admitted negligence when he filed a claim with his insurance provider.

As the trier of fact, the court was within its discretion to believe Emond's testimony regarding his conversation with Tiadore and to discredit the testimony of Thomas Burt. Dow-Burt testified at her deposition on September 24, 2007, that she did not know what special instructions Tiadore gave Emond when Tiadore delivered Eiffel Tower. The court also pointed out Dow-Burt's admission that, upon learning of the injury to Eiffel Tower, it would have been natural to question her husband about whether any special instructions

regarding turning out were given to the defendant. Further, Dow-Burt could have easily warned the defendant not to turn out Eiffel Tower in the special instructions section of the boarder agreement. She chose not to do so. The combination of Dow-Burt's testimony, coupled with her failure to give any instructions regarding turning out, led the court to find Thomas Burt's testimony implausible.

Furthermore, the court's determination that the defendant did not violate any standard of care was not against the weight of the evidence. Both Jonathan Davis, a veterinarian, who operates a large equine reproductive clinic in New York, and Emond testified at trial regarding the standard of care. Davis testified that unless a horse's owner had given instructions otherwise, it is standard practice to turn mares out together while they are at a veterinary facility for breeding purposes. According to Davis, turning out two mares together produces a calming effect and facilitates the breeding process. Additionally, he testified that horses sometimes injure themselves when they are turned out by themselves, making it difficult to predict whether herd turnout increases the likelihood of an injury.

Consequently, the defendant took reasonable precautions to prevent an altercation between Eiffel Tower and Anna. Davis testified that before a stable turns two horses out together, someone must supervise their interaction to make sure that they get along. Emond testified that upon arrival, Eiffel Tower was put directly into a stall with another horse, and she was supervised when she was introduced to her pasture mate, Anna.[3] The court properly concluded that there was no credible evidence that the defendant violated any prevailing

---

[3] It should also be noted that Eiffel Tower and Anna were turned out together for almost two months, between April 4 and June 1, 2004, without incident.

standard of care in veterinary medicine with respect to Eiffel Tower.

Finally, the plaintiff claims that the defendant admitted negligence by filing a report of claim form after the injury to Eiffel Tower.[4] The plaintiff contends that the defendant admitted negligence on this form, and, therefore, the court's judgment in favor of the defendant is against the weight of the evidence. While the plaintiff's argument has some merit, we cannot find that, in light of all the evidence available, the court's decision was against the weight of the evidence.

"Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 487, 970 A.2d 592 (2009).

The insurance form in question is from the defendant's professional liability policy. The claim form states, "[d]o you consent to payment of this claim," and the defendant checked the "yes" box. Just below, the form states, "[i]f you marked yes or uncertain, please explain why you feel you were negligent in the care you provided in the space below." In that space, the defendant typed, "[s]ee attached letter" and attached a description of the incident.[5]

---

[4] The court did not specifically address this issue in its memorandum of decision.

[5] The attached letter stated: "Re: Description of circumstances leading to the claim

"On June 6, 2004, Eiffel Tower was kicked in the right hind leg by a pasture-mate. She suffered a serious dislocation of the right hind hock joint. Initial therapy using manual replacement and splinting was successful in putting the joint back in correct anatomic location. Eiffel Tower continues to be comfortable in a pasture-only situation maintained on non-steroidal

Nevertheless, the defendant asserts that he never intended to admit negligence on that form.[6] Rather, the defendant maintains that his intention was to submit a claim for reimbursement under his professional extension coverage, a separate policy to cover monetary loss with respect to accrued but unpaid charges.[7] Pursuant to the professional extension coverage form-bailee supplement, coverage includes "monetary loss to the [i]nsured of accrued but unpaid charges made by the [i]nsured, when such charges are rendered uncollectable by reason of a covered loss or damages to insured property." According to the policy language, it was not necessary for the defendant to admit negligence in order to collect under that policy.

Although the defendant may have unintentionally admitted negligence on the form, the court is the sole arbiter of the credibility of witnesses and the weight to be given specific evidence. *New Hartford* v. *Connecticut Resources Recovery Authority*, supra, 291 Conn.

---

anti-inflammatory medication. Her prognosis for future soundness and carrying a foal is very poor at this time.

"The owner is requesting compensation for medical expenses directly related to the injury under my care.

"The total medical expenses to this date are $12,500.00 and rising."

[6] At trial, when specifically asked whether he admitted negligence in that claim, Emond responded, "[n]o."

[7] At trial, the following colloquy occurred:

"[The Defendant's Counsel]: I'm going to show you a document that I believe has already been marked as a full exhibit. It's exhibit six, plaintiff's exhibit six. Is that your insurance policy?

"[The Witness]: Yes.

"[The Defendant's Counsel]: And what we've been talking about here is care, custody and control portion of the policy. Is that caption professional extension coverage form—

"[The Witness]: Yes. . . .

"[The Defendant's Counsel]: But you are making a claim, and I think counsel had brought this out earlier, that you are making a claim to cover the expenses that have been incurred by [the plaintiff] for the medical care rendered to Eiffel Tower. Is that correct?

"[The Witness]: That's correct."

487. We must give great deference to the court's factual findings. Id. Based on the facts established at trial, the court determined that the defendant was not negligent. In light of the entire record before us, we find that the court's determination was not clearly erroneous.

## II

The plaintiff also claims that the court erred in determining that, in support of the defendant's counterclaim, the "hold harmless" clause of the boarder agreement was valid.[8] We disagree.

We must first set forth the standard of review for the plaintiff's claim. We are called on to construe whether the court properly gave effect to the hold harmless provision of the boarder agreement signed by the parties. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . [T]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the

---

[8] The defendant's counterclaim alleged in part: "2. At all times material to the plaintiff's [c]omplaint, the plaintiff and defendant were parties to a written [b]oarder [a]greement which provides that the plaintiff, as horse owner, agreed to release and hold harmless the defendant, Candlewood Equine, and its employees, representatives and contractors from and against any liabilities, claims and damages associated with the horse known as 'Eiffel Tower,' its medical or professional care, boarding or conduct while at Candlewood Equine unless the same results from Candlewood Equine's gross negligence or willful misconduct.

"3. Because the plaintiff alleges liability, claims and damages associated with the horse which do not result from any gross negligence or willful misconduct on the part of Candlewood Equine, the aforementioned hold harmless clause in the [b]oarder [a]greement has been triggered and the plaintiff is liable to the defendant for all costs including attorneys fees incurred in defending the claim for damages associated with the horse and the boarding and professional care of the horse while at Candlewood Equine."

contract is unambiguous and the intent of the parties can be determined from the agreement's face. . . . [T]he construction and legal effect of the contract [is] a question of law for the court." (Citations omitted; internal quotation marks omitted.) *Short* v. *Connecticut Bank & Trust Co.*, 60 Conn. App. 362, 367, 759 A.2d 129 (2000). Although the parties disagree as to the legal effect of the boarder agreement, neither claims that the language is ambiguous. Accordingly, our review of this question of law is plenary. See id.

Connecticut courts generally disfavor hold harmless provisions as against public policy. "[T]he law does not favor contract provisions which relieve a person from his own negligence . . . ." (Internal quotation marks omitted.) *Reardon* v. *Windswept Farm, LLC*, 280 Conn. 153, 159, 905 A.2d 1156 (2006). Our courts are careful not to allow hold harmless provisions to preclude recovery where there is unequal bargaining power between contracting parties. See *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 333–34, 885 A.2d 734 (2005).

Nonetheless, our courts have recognized the enforceability of hold harmless provisions releasing a defendant from liability for his own negligence where the parties to the contract are both commercial entities. *Dwight Building Co.* v. *Stamford House Wrecking Co.*, 193 Conn. 297, 301–302, 476 A.2d 568 (1984); *B & D Associates, Inc.* v. *Russell*, 73 Conn. App. 66, 72–73, 807 A.2d 1001 (2002); *Burkle* v. *Car & Truck Leasing Co.*, 1 Conn. App. 54, 57–58, 467 A.2d 1255 (1983). "In modern commerce, indemnity clauses are no longer so unusual as to require such specific mention of the indemnitee's conduct as being within the scope of the indemnifying obligation. . . . Indemnity clauses in contracts entered into by businesses . . . should be viewed realistically as methods of allocating the cost of the risk of accidents apt to arise from the performance of the contract." (Citation omitted; internal quotation marks omitted.)

*Laudano* v. *General Motors Corp.*, 34 Conn. Sup. 684, 687, 388 A.2d 842 (1977).

On April 14, 2004, Dow-Burt, president of the plaintiff corporation, signed the boarder agreement that had been faxed to her by the defendant. The release and hold harmless provision on which the defendant relies in its counterclaim is contained within that boarder agreement.[9] As the court reasoned, both the plaintiff and the defendant are commercial entities similar in experience and sophistication. The plaintiff is a corporation in business since 1967, whose president, Dow-Burt, is a college graduate. The plaintiff runs a horse farm that boards and trains horses, provides riding lessons and hosts regular horse shows. The defendant is a corporation that boards horses and provides veterinary and horse breeding services.

In the present case, the hold harmless provision was an agreement to allocate a predictable risk between two commercial entities of equal bargaining power, and the provision was not an attempt to limit liability for personal injuries.[10] In fact, the plaintiff regularly

[9] The applicable part of the agreement provides: "Candlewood Equine and its employees, representatives, and contractors will endeavor to properly supervise and directly provide proper, professional care for your horse. As the horse owner, you understand and agree that there is inherent risk involved with the handling and management of horses, and you hereby agree to release and hold harmless Candlewood Equine and its employees, representatives and contractors from and against any liabilities, claims and damages associated with the horse, its medical or professional care, boarding, or conduct while at Candlewood Equine, unless the same results from Candlewood Equine's gross negligence or willful misconduct."

[10] The plaintiff argues that our Supreme Court has repeatedly struck down hold harmless agreements excusing an entity's future negligence, citing specifically *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 314. In *Hanks*, the court struck down a waiver of liability signed by a snowtuber who was injured seriously while snow tubing. That case, however, is distinguishable from the present case. In that case, the defendant had subjected the plaintiff to potential severe bodily harm or death. Id., 334–35. Moreover, the court stated that even though snow tubing is a voluntary activity, recreational activities are an important and healthy part of everyday life that are supported by public policy considerations. Id. The present case does not

requires its own riding and horse show clients to sign documents containing hold harmless clauses very similar to the defendant's.[11] Although Dow-Burt asserted that she did not read the hold harmless provision of

involve a personal health or safety issue but, rather, economic damages to a commercial enterprise.

[11] Dow-Burt testified that customers taking riding lessons were required to sign the following provision: "[T]he [u]ndersigned does hereby agree to hold harmless and indemnify WHC [Westbrook Hunt Club] and further release WHC, its owner(s), agents, servants, and employees from any liability or responsibility for accident, damage, injury, or illness to the undersigned or any horse owned by the [u]ndersigned or to any family member or spectator accompanying the [u]ndersigned while under the direction and instruction of WHC, its owner(s), agents, servants, and employees."

Additionally, when the plaintiff boards a horse, it asks its customer to sign a boarding contract that contains the following provisions: "5. RISK OF LOSS: While the horse is boarded at WHC, WHC shall not be liable for any sickness, disease, theft, death or injury suffered by the horse or any other cause of action arising from or connected to the boarding of said horse. The OWNER fully understands that WHC does not carry any insurance on any horse not owned by it for boarding or any other purposes, for which the horse is covered under any public liability, accidental injury, theft, or equine mortality insurance, and that all costs, no matter how great, connected with boarding are to be born by the OWNER.

"6. HOLD HARMLESS: Owner agrees to hold WHC harmless from . . . any claim resulting from personal or property damage or injury caused by said horse to anyone and agrees to pay any legal fees and/or expenses incurred by WHC in defense of such claims. . . . [W]ithin the [b]oarding [c]ontract the undersigned hereby acknowledges that the Westbrook Hunt Club is not liable for any injury to, or the death of, a participant in equine activities resulting from the inherent risks of equine activities, pursuant to Section 52-577p of the Connecticut General Statutes . . . ."

Last, horse shows sanctioned by the United States Equestrian Federation regularly take place at Westbrook Hunt Club. That federation requires those participating in its horse shows to sign the following indemnification provision: "I AGREE that I choose to participate voluntarily in the Competition with my horse, as a rider, driver, handler, vaulter, longeur, lessee, owner, agent, coach, trainer, or as a parent or guardian of a junior exhibitor. I am fully aware and acknowledge that horse sports and the Competition involve inherent dangerous risks of accident, loss, and serious bodily injury including broken bones, head injuries, trauma, pain, suffering, or death ("Harm"). I AGREE to release the Federation and the Competition from all claims for money damages or otherwise for any Harm to me or my horse and for any Harm caused by me or my horse to others, even if the Harm resulted, directly or indirectly, from the negligence of the Federation or the Competition."

the defendant's boarder agreement before signing it, she also admitted that she was familiar with the language, as she has used nearly identical provisions in her own agreements at Westbrook Hunt Club for "probably ten years or so." During cross-examination, Dow-Burt acknowledged that her corporation has legal counsel to call if any legal questions arise during the course of business, and at no point in her testimony did Dow-Burt assert that she did not understand the language of the agreement.

The defendant's boarder agreement required the plaintiff to acknowledge that there was inherent risk in managing and handling horses and required the plaintiff to release and to hold the defendant harmless from all damages associated with the horse unless caused by "gross negligence or willful misconduct." Thus, by signing the agreement, the plaintiff agreed to hold the defendant harmless for any injuries to Eiffel Tower, unless caused by the gross negligence or wilful misconduct of the defendant.[12]

In addition, the court heard evidence that the plaintiff could have had Eiffel Tower inseminated at a different stable. Even if the plaintiff specifically required that Eiffel Tower be inseminated by the stallion Rodney, Emond testified that the defendant could have packaged and shipped the semen for use at another veterinary facility by a different veterinarian. In essence, the plaintiff was never faced with the type of "take it or leave it" approach often found in cases of unequal bargaining power. See *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 333. The facts established by the court lead us to conclude that the plaintiff had

---

[12] The court also notes that, as a further indication that the agreement was a commercial risk allocation device, the boarding agreement "contained a statement as to the value of Eiffel Tower and also an acknowledgment that the horse was insured, as well as the name of the insurance agency and insurance policy number."

commercial experience similar to and bargaining power equal to that of the defendant when the plaintiff signed the defendant's boarder agreement.

Moreover, the plaintiff argues that the hold harmless provision of the agreement should be void as against public policy. We disagree. "Although it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable. . . . [T]he question [of] whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review. . . . Thus, it is consistent with public policy to posit the risk of negligence upon the actor and, if this policy is to be abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." (Citations omitted; internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 326–27.

"A frequently cited standard for determining whether exculpatory agreements violate public policy was set forth by the Supreme Court of California in *Tunkl* v. *Regents of the University of California*, [60 Cal. 2d 92, 98–101, 383 P.2d 441, 32 Cal. Rptr. 33 (1963)]. In *Tunkl*, the court concluded that exculpatory agreements violate public policy if they affect the public interest adversely; id., at 96–98; and identified six factors (*Tunkl* factors) relevant to this determination: '[1] [The agreement] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who

seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.' Id., at 98–101. The court clarified that an exculpatory agreement may affect the public interest adversely even if some of the *Tunkl* factors are not satisfied." *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 328.

In *Hanks*, our Supreme Court held that "[n]o definition of the concept of public interest can be contained within the four corners of a formula. . . . [T]he ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations. . . . Thus, our analysis is guided, but not limited, by the *Tunkl* factors, and is informed by any other factors that may be relevant given the factual circumstances of the case and current societal expectations." (Citations omitted; internal quotation marks omitted.) Id., 330.

In the present case, the hold harmless provision does not violate public policy. As a general matter, horse breeding does not appreciably impact the health or safety of the general public. Also, horse breeding is not an essential practice. Most importantly, both the plaintiff and the defendant were commercial entities of

equal knowledge and bargaining power. The decision to breed and to board a horse involves choosing a stable, a veterinarian, negotiating a price and the careful act of transporting a horse to the chosen stable. Unlike the decision to go snow tubing, as in *Hanks,* the plaintiff had other available veterinary options, and the choice to board Eiffel Tower with the defendant was most certainly carefully planned. The boarder agreement required the plaintiff to list detailed care and insurance information for Eiffel Tower, and the plaintiff complied with those requirements.

For the aforementioned reasons, we find that the hold harmless provision of the boarder agreement does not violate public policy. The court correctly determined that Dow-Burt released the defendant from the plaintiff's negligence claim when she signed the boarder agreement, which required a showing of gross negligence or wilful misconduct to hold the defendant liable. Therefore, the court properly awarded reasonable damages on the defendant's counterclaim.

### III

The plaintiff's final claim is that the court erred by failing to allow the plaintiff's expert witness, Brett Gaby, a veterinarian, to testify at trial. According to the court, the key issue in this case was the standard of care in allowing broodmares to be turned out together at a veterinary clinic. The court determined that although Gaby had some experience with equine reproduction, he specializes in lameness and was not qualified to testify regarding reproduction and the standard of care for turning out horses. We conclude that the court erred in failing to allow Gaby to testify; however, this error was harmless.

The following additional facts and procedural history are relevant to our resolution of the plaintiff's claim. Before trial, the plaintiff disclosed Gaby as its expert

on the standard of care for turning out horses. Gaby has extensive education, training and experience in the area of equine medicine. He has a bachelor's degree from Cornell University and received his doctorate in veterinary medicine from Mississippi State University. He is a member of both the American Veterinary Medical Association and the American Association of Equine Practitioners. Gaby worked as a clinical intern at Rochester Equine Clinic in Rochester, New Hampshire, and before opening his own practice, he worked at Boston Equine Associates for four years. In 2003, he opened his current practice, Essex Equine, LLC, in Bolton, Massachusetts, which consists of three veterinarians, focusing on reproduction, acupuncture, dentistry and lameness. Approximately 80 percent of Gaby's current practice focuses on lameness.

In its amended expert witness disclosure, the plaintiff asserted that in light of these qualifications, Gaby was expected to testify as to the "applicable standard of care for taking care of mares in preparation for breeding, during the breeding process and subsequent thereto." The plaintiff stated that "Gaby will testify that it was not reasonably prudent to turn out mares in heat together, especially during the period of time while the mares were being artificially inseminated. That by doing so placed the subject mares in harms way and ultimately [led] to a severe and permanent injury. That said injury effectively ended the mare's career both as a performance horse and as a broodmare." At trial, the court ruled that Gaby was unqualified to render an expert opinion as to the standard of care for turning out horses, citing Gaby's specialty in lameness as the reason.

We begin our review of this issue by setting forth the well established standard of review regarding a trial court's ruling on the admissibility of expert testimony. "[T]he trial court has wide discretion in ruling on the

admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . Even if a court has acted improperly in connection with the introduction of evidence, reversal of a judgment is not necessarily mandated because there must not only be an evidentiary [impropriety], there also must be harm." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 157–58, 971 A.2d 676 (2009).

Our Supreme Court "recently articulated the test for the admission of expert testimony, which is deeply rooted in common law. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) Id., 158; see also Conn. Code Evid. § 7-2.[13] In other words, "[i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Internal quotation marks omitted.) *State* v. *Douglas*, 203 Conn. 445, 452, 525 A.2d 101 (1987).

"It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter;

---

[13] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience must be directly applicable to the matter specifically in issue." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 158–59; see also *State* v. *Douglas*, supra, 203 Conn. 453 ("in order to be admissible, the proffered expert's knowledge must be directly applicable to the matter specifically in issue").

Resolution of the issue before us turns on whether Gaby was qualified to render an expert opinion on the turnout of horses. Gaby testified that he was familiar with turning out horses for breeding purposes. Although his current practice focuses mainly on lameness, he testified that he has worked with artificial insemination in the past and that he still does some breeding. Gaby further testified that he has been "involved in the design and layout of the turnout situation because it is, after all, [his] practice and [he has] veterinary support working under [him]." Gaby stated that he was familiar with breeding and horse turnout and dealt specifically with the process while at the University of Mississippi. Finally, Gaby testified that, on the basis of his knowledge and experience, he would feel comfortable turning a horse out and has mares of his own at the clinic that he turns out.

Although Gaby may not specialize in turning out horses, he is a qualified veterinarian with experience and knowledge uncommon to the world that could have assisted the trier of fact in this case. Accordingly, we conclude that the court improperly precluded Gaby's expert testimony.

We next must determine whether the preclusion of Gaby's testimony was harmful. "[E]ven if a court has acted improperly in connection with the introduction of evidence, reversal of a judgment is not necessarily mandated because there must not only be an evidentiary [impropriety], there also must be harm. . . . The harmless [impropriety] standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless. . . . Moreover, an evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict. . . .

"A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial. . . . Thus, our analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 161–62; see also *Raudat* v. *Leary*, 88 Conn. App. 44, 52–53, 868 A.2d 120 (2005) (improperly admitted expert testimony was harmful error when it related to central issue in case, namely, condition of purchased horse); *DeMarkey* v. *Fratturo*, 80 Conn. App. 650, 656–57, 836 A.2d 1257 (2003) (improperly admitted hearsay evidence about cause of motor vehicle accident was harmless because it was cumulative of properly admitted

testimonial and diagram evidence). "The overriding question is whether the trial court's improper ruling affected the jury's perception of the remaining evidence." (Internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 163.

In the present case, the plaintiff has not met the burden of demonstrating harmful error. The court concluded, from the totality of the evidence, that the defendant did not violate any prevailing standard of care by turning out Eiffel Tower with another mare. The issue facing us is whether, in light of the record, the testimony of the plaintiff's expert, Gaby, would have affected that result at trial. The preclusion of that testimony did not prevent the court from considering relevant and material evidence that affected the ultimate issue of the case, and both parties offered other testimony as to the standard of care. Moreover, the court made a factual determination to credit the testimony of Emond regarding his conversation with Tiadore. Gaby's testimony would not have affected the court's determination that Tiadore, through his statements, effectively gave the defendant permission to turn out Eiffel Tower.

Further, although the plaintiff proffered Gaby's expected testimony in its expert witness disclosure, we have no record by which to determine that Gaby would have actually testified to those claims. Finally, because the signed boarder agreement held the defendant harmless from all claims and damages absent the defendant's "gross negligence or willful misconduct," Gaby's testimony would not have affected the case's outcome.

Although we conclude that the court improperly precluded Gaby's expert testimony, the court's impropriety in precluding that testimony was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.