CLEAVEN A. JOHNSON, JR. *v.* BOARD OF EDUCATION OF THE CITY OF NEW HAVEN ET AL.
(AC 31239)

Gruendel, Lavine and Dupont, Js.

---

Argued March 9—officially released July 19, 2011

*Max F. Brunswick*, with whom was *Josephine Smalls Miller*, for the appellant (plaintiff).

*Warren L. Holcomb*, for the appellees (defendants).

*Opinion*

LAVINE, J. In this action involving a claim of wrongful termination from employment, the plaintiff, Cleaven A. Johnson, Jr., appeals from the judgment of the trial court denying his motion for a new trial in favor of the defendants, the board of education of the city of New Haven (board), Reginald Mayo, superintendent of public schools for the city of New Haven (city), and Deborah Speese-Linehan,[1] the plaintiff's supervisor. The plaintiff claims that the court abused its discretion in denying his motion because it committed reversible error when it (1) excluded testimony offered by the plaintiff as to statements made by him and several coworkers concerning matters related to the workplace, (2) excluded from evidence article 20, section 9, of the collective bargaining agreement (agreement) between the city and the New Haven Management & Professional Management Union, Local 3144, Council 4, AFSCME, AFL-CIO (union), (3) refused to instruct the jury that the law

---

[1] Although the initial complaint and pleadings refer to Speese-Linehan as Dee Spence Linehan, and other variations of that name, we refer to her in this opinion as Deborah Speese-Linehan.

does not permit any presumptions that individuals will not discriminate or retaliate against another person because they are of the same race and (4) denied his motion for recusal because the judge who conducted the pretrial conference also presided over the jury trial. We disagree with the plaintiff and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The board hired the plaintiff in 2000 under a federal grant as an in-school drug education prevention worker at Jackie Robinson Middle School. The plaintiff's responsibilities in this position included monitoring a karate class that took place before the start of the school day. Speese-Linehan visited the karate class on three occasions, and on two of the three occasions the plaintiff was not present for the class and on the other occasion he arrived late. The plaintiff was issued a written warning and placed on a plan of improvement due to his inadequate supervision of the karate class. Before completing the plan, however, the plaintiff took a leave of absence for the entire 2001–2002 school year.

In 2002, the plaintiff returned to work for the board under the supervision of Speese-Linehan. The plaintiff first assisted with a police officer-student mentoring program and then Speese-Linehan assigned the plaintiff to develop ideas for a faith based initiative program for New Haven, both grant funded positions. Although the plaintiff's primary duty in this second position was development of a faith based initiative program, he was given the job title of drug education prevention worker.

In January, 2003, the plaintiff attended a meeting of the Association of Black Clergy of Greater New Haven (association) to talk about faith based initiatives. The Reverend Boise Kimber, the president of the association, allowed the plaintiff to address the attendees

because the plaintiff represented that Mayo had sent him to speak to the group and because the plaintiff had business cards which indicated that he was the coordinator of faith based initiatives for the New Haven public school system. After the meeting, Kimber called Mayo to ask him why he had not given the association prior notice that he had sent the plaintiff to the meeting to talk about faith based initiatives. Mayo responded that he had not sent the plaintiff to the meeting. Mayo also never appointed the plaintiff as the faith based initiative coordinator.

On January 23, 2003, the plaintiff met with Mayo and Speese-Linehan to discuss his misrepresentations to the association. At this meeting, Mayo became upset over the misrepresentations made by the plaintiff and told the plaintiff that he could not use the business cards indicating that he was the faith based initiative coordinator for the city. Despite Mayo's displeasure with the plaintiff's conduct, no formal discipline was imposed at this time.

Mayo also spoke to the plaintiff about complaints the plaintiff previously made to a coworker concerning the promotion of Scott X. Esdaile, a board employee. Prior to the January 23, 2003 meeting, several coworkers expressed their anger to the plaintiff about another employee named Carolyn Ross-Lee who recently received an increase in salary. In response, the plaintiff met with Ross-Lee and told her that he could get mad at the "system" too because Esdaile had just received a raise in salary but did not have a bachelor's degree. Mayo became aware of the plaintiff's statements about Esdaile and told the plaintiff that if he had an issue with Esdaile's raise in salary, he should have come to him directly rather than talking to other employees about it.

In July, 2003, pursuant to Speese-Linehan's recommendation, the plaintiff was laid off from employment

because the grant under which he was working had expired.[2] Another board employee, whose position was funded from the same grant, was also laid off on this date.[3]

The plaintiff initiated this action against the defendants, alleging a violation of his first amendment rights pursuant to the United States and Connecticut constitutions, a violation of his free speech rights under state law and breach of an oral contract. The matter was tried before a jury and the jury returned a verdict in favor of the defendants. According to the jury interrogatories, the jury concluded that while the plaintiff had engaged in protected speech, his comments about Esdaile's raise in salary were not a substantial or motivating factor in the decision to end his employment. The jury also concluded that the plaintiff had failed to prove that the parties had an employment agreement that was definite and certain as to its essential terms and requirements.

On April 16, 2009, the plaintiff filed motions to set aside the verdict and for a new trial. In his motion for a new trial, the plaintiff claimed that the court (1) improperly excluded testimony regarding the content and context of the plaintiff's protected speech, (2) improperly excluded evidence regarding the agreement, (3) failed to charge the jury regarding presumptions about race and (4) failed to disqualify itself from presiding over the jury trial.[4] Addressing each claim in turn,

[2] Board employees are laid off when a grant expires or they decide to depart from their employment with the board and look for work elsewhere.

[3] It was possible that the plaintiff could have maintained employment with the board under a new grant funded position by writing a letter of intent expressing his desire to be considered for employment; however, the plaintiff never wrote such a letter and was not considered for a new position with the board.

[4] In his motion to set aside the verdict, the plaintiff claimed that the verdict was against the weight of the evidence and, therefore, the jury's verdict disregarded the law or the verdict was the result of some mistake or prejudice. In denying this motion, the court concluded that the jury reasonably could have reached its verdict based on the totality of the evidence and the

the court denied the plaintiff's motions on June 11, 2009. This appeal followed. Additional facts will be set forth as necessary.

The plaintiff now claims on appeal that the court improperly denied his motion for a new trial. "Our standard of review of such a claim is the abuse of discretion standard. . . . A petition for a new trial is addressed to the discretion of the trial court and will never be granted except upon substantial grounds. As the discretion which the court is called upon to exercise is not an absolute but a legal one, we will upon appeal set aside its action when it appears that there was a misconception on its part as to the limits of its power, that there was error in the proceedings preliminary to the exercise of its discretion, or that there was a clear abuse in its exercise of its discretion." (Citation omitted; internal quotation marks omitted.) *LaCroix* v. *Glens Falls Ins. Co.*, 107 Conn. App. 332, 334–35, 945 A.2d 489 (2008).

I

In his first two claims, the plaintiff challenges two evidentiary rulings made by the court. Specifically, the plaintiff claims that the court committed reversible error in excluding a portion of his testimony on the grounds that it was irrelevant and inadmissible hearsay and in excluding article 20, section 9, of the agreement between the city and the union from evidence on the ground that it was irrelevant. We disagree and conclude that the court properly excluded the plaintiff's testimony and article 20, section 9, of the agreement from evidence.

reasonable inferences drawn therefrom. Although the plaintiff also appeals from the denial of his motion to set aside the verdict, he makes no claims that the evidence weighed against the jury's verdict. We, therefore, address only the claims raised concerning the denial of his motion for a new trial.

"[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Lombardi* v. *East Haven*, 126 Conn. App. 563, 567, 12 A.3d 1032 (2011). "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review." (Internal quotation marks omitted.) *State* v. *Grant*, 127 Conn. App. 654, 658, 14 A.3d 1070 (2011).

"Evidence is relevant when it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . As it is used in our code, relevance encompasses two distinct concepts, namely, probative value and materiality. . . . [M]ateriality turns upon what is at *issue* in the case, which generally will be determined by the pleadings and the applicable substantive law." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Smart* v. *Corbitt*, 126 Conn. App. 788, 810–11, 14 A.3d 368 (2011). "What is in issue is determined by the pleadings and these must be in writing. . . . Once the pleadings have been filed, the evidence proffered must be relevant to the issues raised therein." (Internal quotation marks omitted.) *Foncello* v. *Amorossi*, 284 Conn. 225, 233, 931 A.2d 924 (2007).

"[T]he law regarding out-of-court statements admitted for the truth therein is well settled. An out-of-court statement offered to establish the truth of the matter

asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Canady*, 297 Conn. 322, 340–41, 998 A.2d 1135 (2010).

A

The plaintiff first claims that the court committed reversible error in excluding testimony offered by him as to statements he made during a conversation with Ross-Lee and as to statements made by his coworkers about Ross-Lee. The plaintiff argues that because the court excluded this portion of his testimony, it limited the jury's ability to determine what role his comments concerning Esdaile's raise in salary played in the defendants' decision to lay off the plaintiff from employment. We are not persuaded.

The following additional facts are relevant to this claim. During trial, the plaintiff testified that other employees in his department had spoken to him about Ross-Lee's new job position and salary increase. Before the plaintiff could testify as to what his coworkers told him about Ross-Lee and what he told Ross-Lee during a private conversation, the defendants objected on the grounds that these statements were irrelevant and impermissible hearsay. Outside the presence of the jury, the plaintiff stated that he intended to testify that several coworkers indicated to him that they were upset over the decision to give Ross-Lee a raise in salary. The same coworkers were also upset that Ross-Lee had been going around the office saying, "[o]h, I just love politics. I just love politics." The plaintiff further stated that in response to his coworkers' complaints, he told Ross-Lee that she needed to stop making the comments about how she loved politics. It was during this conversation with Ross-Lee that the plaintiff also commented about Esdaile's raise in salary, comments which Mayo

referenced in his January 23, 2003 meeting with the plaintiff.

The plaintiff's counsel argued that the plaintiff's statements to Ross-Lee and the statements made by his coworkers were necessary for the jury to determine if the comments made by the plaintiff concerning Esdaile's promotion were protected speech. Specifically, counsel argued that these statements provided the necessary context for the jury to determine whether the plaintiff's comments about Esdaile's raise in salary had a broader public concern. See *DiMartino* v. *Richens*, 263 Conn. 639, 667, 822 A.2d 205 (2003) ("[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record" [internal quotation marks omitted]). Counsel also argued that the statements constituted circumstantial evidence that tended to show what exactly was reported to Mayo concerning the plaintiff's conversation with Ross-Lee.

The court sustained the defendants' objection and concluded that the statements made to Ross-Lee were irrelevant because the complaint did not contain any allegations concerning Ross-Lee and that the statements made by the plaintiff's coworkers were inadmissible hearsay. In denying the plaintiff's motion for a new trial, the court maintained that the excluded testimony regarding the plaintiff's statements to Ross-Lee was irrelevant and the testimony regarding the statements made by the plaintiff's coworkers was hearsay. The court further noted that the plaintiff's argument failed because the jury found in favor of the plaintiff on the issue of whether his comments about Esdaile's raise in salary were protected speech. We conclude that the court properly excluded the testimony.

In the operative complaint, the plaintiff alleges that "[t]he real reason for [his] termination was Dr. Mayo's

voiced displeasure with the plaintiff over several unrelated matters, including . . . [t]he plaintiff voiced dissatisfaction when he was not given the promised raise that Scott X. Esdaile, who is the president of the NAACP and is not even a college graduate was being paid a salary of $55,000 per year by the board." Concerning this allegation, the jury had two tasks to complete before returning a verdict. First, the jury had to determine whether the plaintiff's statements about Esdaile's raise in salary constituted speech on a matter of public concern and, second, whether the plaintiff's speech was a substantial or motivating factor in the defendants' decision that the plaintiff be laid off from employment. See *D'Angelo* v. *McGoldrick*, 239 Conn. 356, 362, 685 A.2d 319 (1996).

As for the jury's first task, we need not reach the issue of whether the plaintiff's statements to Ross-Lee about her new position and raise in salary were relevant or if the statements made by the plaintiff's coworkers about Ross-Lee were inadmissible hearsay. Even if the court abused its discretion in excluding the plaintiff's testimony, any error was harmless. "The harmless [impropriety] standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless. . . . Moreover, an evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict." (Internal quotation marks omitted.) *Dow-Westbrook, Inc.* v. *Candlewood Equine Practice, LLC*, 119 Conn. App. 703, 722, 989 A.2d 1075 (2010).

The jury noted in its interrogatories that in making the statements about Esdaile's raise in salary to Ross-Lee, the plaintiff was speaking out as a citizen on a

matter of public concern. The jury, therefore, reached the conclusion that the plaintiff had engaged in constitutionally protected speech despite not having heard the excluded testimony.[5]

As to the jury's second task, we agree with the court that the excluded testimony is not relevant. The plaintiff does not allege in his complaint that he was laid off from employment because he told Ross-Lee that she should stop going around the office saying that she loved politics. See *Edelman* v. *Page*, 123 Conn. App. 233, 243, 1 A.3d 1188 ("parties are bound by their pleadings"), cert. denied, 299 Conn. 908, 10 A.3d 525 (2010). The excluded testimony does not include any references to Esdaile and, as such, it does not make it more probable or less probable that the plaintiff was laid off from employment because of statements about Esdaile. We conclude, therefore, that the court properly denied the plaintiff's motion for a new trial on the basis of his claim that the court improperly excluded a portion of his testimony from evidence.

B

The plaintiff next claims that the court improperly excluded from evidence article 20, section 9, of the agreement between the city and the union. The plaintiff argues that for the jury to determine accurately if he was laid off from employment because of his comments about Esdaile's raise in salary, rather than because of

---

[5] Furthermore, we note that the court allowed the plaintiff to provide other evidence to establish the context for his statements about Esdaile's raise in salary. The court permitted the plaintiff to testify that Ross-Lee got a new position with the board with a $7000 raise in salary, that other employees approached him about Ross-Lee's new position and that he decided to speak with Ross-Lee because his coworkers were very angry and upset over her raise in salary. Any argument by the plaintiff that this evidence was not sufficient to establish the context of his conversation with Ross-Lee is belied by the fact that the jury concluded that the plaintiff's comments concerning Esdaile's promotion were protected speech.

a lack of funding, it needed to have access to the agreement. Again, we disagree and conclude that the court properly excluded from evidence article 20, section 9, of the agreement.

The following additional facts are relevant to this claim. In early November, 2003, a drug education prevention worker who was working for the board died. The plaintiff was on the list of former employees to be recalled for an interview to fill a vacancy within the board, but Speese-Linehan decided not to fill the position. Speese-Linehan did not request to fill the vacancy with the plaintiff for two reasons. First, the grant was in its final year and the federal government prefers not to approve personnel on grants during the final year. Second, Speese-Linehan felt that the plaintiff was not qualified for the position given his past performance.

During trial, the plaintiff attempted to introduce evidence concerning provisions in the agreement. Specifically, the plaintiff sought to introduce article 20, section 9, of the agreement[6] to show that the refusal to recall him to fill the vacant drug education prevention worker position in accordance with the agreement was evidence that he was laid off from employment because of his comments about Esdaile's raise in salary, rather than the stated reason given by the defendants.

The defendants objected to the introduction of this evidence, claiming that it was irrelevant to the plaintiff's

---

[6] Article 20, section 9, of the agreement provides: "In the event of a loss of a grant or reduction in [f]unds whereby the [c]ity has to reduce personnel funded by [s]pecial grants, [g]rants, or ETA [a]dministrative money, those employees holding positions that were cut from the [g]rant shall be laid off unless they are qualified to fill another position in the project or other projects in the reasonable judgment of the [d]epartment [h]ead or [s]pecial [f]und [c]oordinator, or ETA [a]dministrator. *Such employees shall have recall rights for a period of two (2) years in a similar position provided they are qualified to fill another opening in the reasonable judgment of the [d]epartment [h]ead or [s]pecial [f]und [c]oordinator or ETA [a]dministrator.*" (Emphasis added.)

first amendment claim. In response, the plaintiff argued that the agreement was relevant in establishing that he was laid off from employment because of his comments about Esdaile's raise in salary. The court excluded the agreement from evidence, and in its memorandum of decision denying the plaintiff's motion for a new trial, the court concluded that the agreement was irrelevant because "what did or did not occur after the layoff had no logical bearing on the reasons for the layoff."

The plaintiff maintains on appeal that article 20, section 9, of the agreement is relevant because "it established the most critical fact at issue, namely, whether the reason proffered for the layoff . . . was a pretext for the defendants' desire to get rid of the plaintiff because of his exercise of free speech rights." He also claims that the refusal to recall him was highly relevant to the issue of the real reason for his layoff from employment.

We agree with the court that article 20, section 9, is irrelevant to the determination of whether the plaintiff was laid off from employment due to his comments about Esdaile's raise in salary. Additionally, we note that the defendant's argument is unavailing because recall of former employees for position vacancies is not mandated under the agreement.

According to article 20, section 9, former board employees are not guaranteed the right to be recalled every time a position becomes available.[7] See *Alstom*

---

[7] The plaintiff argues that the issue of whether recall is automatic under the agreement is a question of fact for the jury. We conclude that this claim is without merit. "If a contract is unambiguous within its four corners, intent of the parties is a *question of law* requiring plenary review." (Emphasis added; internal quotation marks omitted.) *O'Connor* v. *Waterbury*, 286 Conn. 732, 744, 945 A.2d 936 (2008). We also note that even if the intent of the union and the city were a question of fact for the jury, in order to determine that recall was automatic, the jury would be forced to resort to speculation given that the plain language of the contract did not mandate recall of former employees. This would have been improper. See *Riccio* v. *Harbour Village Condominium Assn., Inc.*, 281 Conn. 160, 163, 914 A.2d 529 (2007)

*Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 610, 849 A.2d 804 (2004) ("[w]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms" [internal quotation marks omitted]). The defendants did not violate the agreement by not recalling the plaintiff to fill the vacant drug education prevention worker position. Their decision, therefore, does not support the plaintiff's allegation that the proffered reason for the layoff was pretextual. Accordingly, we conclude that article 20, section 9, is irrelevant to the plaintiff's first amendment claim because it does not tend to make it more or less likely that the plaintiff was laid off from employment because of his comments about Esdaile's raise in salary.

The plaintiff argues that this court's decision in *Chouinard* v. *Marjani*, 21 Conn. App. 572, 575 A.2d 238 (1990), is dispositive of his claim.[8] We disagree. Although *Chouinard* supports the plaintiff's argument

("[a]lthough it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation" [internal quotation marks omitted]).

[8] In *Chouinard*, the defendant, an oncology surgeon, performed surgical procedures on the plaintiff to excise masses in both her breasts. *Chouinard* v. *Marjani*, supra, 21 Conn. App. 573–74. The plaintiff denied that she gave her consent for surgery on her right breast, however, the defendant claimed that the plaintiff was informed of, and gave oral consent to, the bilateral surgery. Id., 574. The defendant filed a motion in limine seeking to prevent the plaintiff or her lawyer from making any reference to an alleged falsification of her signature on a consent form for the bilateral surgery without any claims or proof that the defendant forged her name. Id., 575. The court granted the motion, concluding that because the defendant was relying on oral consent for the surgery, the document was irrelevant and prejudicial to the defendant. Id.

This court concluded that the trial court erred in excluding the consent form from evidence because the allegedly forged form was relevant to the jury's assessment of the inconsistencies in the defendant's claims concerning what form of consent he received from the plaintiff to perform surgery on both her breasts. Id., 576. This court also concluded that it was error for the trial court to fail to find sufficient evidence linking the defendant to the consent form as a foundation for admitting the document in its entirety. Id., 577.

that when a trial court erroneously excludes relevant evidence this court can reverse the judgment of the court, it does not tend to support his argument that article 20, section 9, was relevant to his first amendment issue.[9]

## II

The plaintiff's third claim is that the court committed reversible error when it refused to instruct the jury that the law does not permit any presumptions to be made that individuals will not discriminate or retaliate against another person because they are of the same race. We agree with the court that the issue of race is irrelevant to this case and conclude that the court properly declined to give the plaintiff's requested instruction.

The following additional facts are necessary for the resolution of this claim. The plaintiff requested that the court instruct the jury that "the law does not permit any presumptions to be made that individuals will not discriminate or retaliate against someone simply because they are of the same race," and that they "may not make any presumptions regarding the role that may have been played by race in assessing the facts regarding the conduct of the defendants." The defendants objected to the request, claiming that race was irrelevant to the issues raised in the complaint. The court agreed with the defendants and concluded that it would

---

[9] In *Chouinard*, "[t]he only issue at trial was whether the plaintiff gave her consent to bilateral surgery, an issue tightly bound to the credibility of the parties, particularly as the defendant asserted that the plaintiff orally consented." *Chouinard* v. *Marjani*, supra, 21 Conn. App. 575. Whether the plaintiff signed a consent form and whether the defendant forged the plaintiff's name on a consent form was, therefore, relevant to the issue before the jury. In the present case, as the plaintiff admits, the issue before the jury was whether the plaintiff was laid off from employment because of a lack of funding or for retaliation because of his comments about Esdaile's promotion. Because the agreement did not mandate that the defendants recall former employees to fill job vacancies, article 20, section 9, is irrelevant.

not give the requested instruction to the jury because "this [is] a case regarding the freedom of expression and not a race discrimination case . . . ." The court did instruct the jury, however, that "sympathy, prejudice and bias were to play no role in their deliberations." In its memorandum of decision denying the plaintiff's motion for a new trial, the court relied on its previous reasoning for refusing to give the requested instruction and added that "[a]ny concern that the jury would engage in discriminatory or biased conduct was alleviated by the court's instruction . . . that improper factors cannot play a part in deliberations."

"The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [W]e must determine whether the jury instructions gave the jury a reasonably clear comprehension of the issues presented for their determination under the pleadings and upon the evidence and were suited to guide the jury in the determination of those issues. . . . [I]n our task of reviewing jury instructions, we view the instructions as part of the whole trial. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *Umsteadt* v. *G. R. Realty*, 123 Conn. App. 73, 79, 1 A.3d 243 (2010).

In the second amended complaint, the plaintiff did not allege that race played a factor in the defendants' decision to lay him off from employment. See *Edelman* v. *Page*, supra, 123 Conn. App. 243. The plaintiff's requested instruction would have caused confusion for the jury and created a side issue, which was not raised in the pleadings. Furthermore, we note that any concerns the plaintiff had concerning juror bias were

addressed when the court instructed the jury that sympathy, prejudice and bias were not to play a role in their deliberations.[10] We conclude, therefore, that the court properly declined to give the plaintiff's requested instruction.

## III

In his final claim, the plaintiff argues that the presiding judge at trial should have recused herself because "no reasonable person who was aware of the trial judge's opinion of this case after the pretrial conference . . . could ever believe that the judge could be fair and impartial." We disagree.

On February 26, 2009, this case was assigned to the court, *Keegan, J.*, for pretrial negotiations. These negotiations were unsuccessful and the case was assigned for a jury trial before Judge Keegan on March 18, 2009. On that day, the plaintiff made an oral motion for Judge Keegan to recuse herself from the case, claiming that because she had been involved in pretrial negotiations, she could not hear the matter. The court denied the motion, citing *Krattenstein* v. *G. Fox & Co.*, 155 Conn. 609, 236 A.2d 466 (1967).[11] The plaintiff submitted a

[10] The plaintiff cites several federal cases from the United States Supreme Court and the United States Court of Appeals for the Second Circuit in support of his claim that the court erred in not giving his requested instruction. Specifically, the plaintiff cites *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998), *Castaneda* v. *Partida*, 430 U.S. 482, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977), *Feingold* v. *New York*, 366 F.3d 138 (2d Cir. 2004), and *Danzer* v. *Norden Systems, Inc.*, 151 F.3d 50 (2d Cir. 1998). None of these cases stands for the proposition that, in a case where racial discrimination is not alleged in the pleadings, the court must instruct the jury that they are not to presume that individuals will not discriminate or retaliate against another person because they are of the same race.

[11] In *Krattenstein*, the plaintiffs initiated an action against the defendant to recover damages for injuries allegedly sustained by one of the plaintiffs when a waitress, employed by the defendant, spilled hot coffee on her arm and leg. *Krattenstein* v. *G. Fox & Co.*, 155 Conn. 610. The case was tried to the court, which rendered judgment for the defendant. Id. On appeal, the plaintiffs claimed that it was error for the judge who held a pretrial confer-

written motion for recusal on March 20, 2009, which the court denied for failure to comply with Practice Book § 1-23. The plaintiff filed a second written motion for recusal, which was referred to the court, *Cosgrove, J.*, on March 25, 2009. Judge Cosgrove denied the motion.

In denying the plaintiff's motion for a new trial, Judge Keegan concluded that "[t]his case was tried to a jury; the trial judge was not called upon to decide the issue of liability and damages as would be the case in a court trial. Any fear that the court would rely on in chambers discussion to the detriment of the plaintiff is belied by the fact that the court denied the defendants' motion for directed verdict. And, the plaintiff raised the same recusal issue before another judge, who also denied the motion."

"The inquiry into whether a motion for disqualification properly was ruled upon is governed by the abuse of discretion standard of review. . . . In applying that standard, we ask whether an objective observer reasonably would doubt the judge's impartiality given the circumstances. . . . If an objective observer, in view of all of the facts would reasonably doubt the court's impartiality, the court's discretion would be abused if

---

ence in his chambers to also preside over the trial. Id., 612. Our Supreme Court concluded that there was no error because the plaintiffs had failed to seek recusal during trial. Id., 615–16. The court did conclude, however, that "[w]hen a jury [is] ultimately to determine the issues of liability and damages, a question is not likely to arise as to the disqualification of the judge who conducted the pretrial hearing and who thereafter presides over the trial of the case. When, however, a judge engages in a chambers conference looking to the settlement of a case which he is about to try as a court and in which he will be called upon to decide the issues of liability and damages, quite a different situation prevails. It is then impossible to avoid questions as to whether the judge can disregard, on the trial, matters disclosed in the conference but unmentioned during the trial and whether a preliminary judgment, formed at the conference and predicated on unsubstantiated claims of proof, may have some subtle influence on a final judgment after a full hearing." Id., 614–15.

a motion to recuse were not granted. In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . .

"[S]peculation is insufficient to establish an appearance of impropriety. As this court has explained, [a] factual basis is necessary to determine whether a reasonable person, knowing all of the circumstances, might reasonably question the trial judge's impartiality. . . . Vague and unverified assertions of opinion, speculation and conjecture cannot support a motion to recuse . . . ." (Citations omitted; internal quotation marks omitted.) *McKenna* v. *Delente*, 123 Conn. App. 137, 143–44, 1 A.3d 260 (2010).

The plaintiff claims that no reasonable person could ever believe that Judge Keegan could be fair and impartial because during pretrial negotiations she stated that the plaintiff would have a difficult time proving his case. The plaintiff further alleges that although this was a jury trial and the court was not the trier of fact, Judge Keegan was still responsible for determining whether there were factual foundations for the introduction of evidence and erroneously refused to admit article 20, section 9, of the agreement.

The mere fact that Judge Keegan stated that the plaintiff would have a difficult time proving his case does not convince us that an objective observer reasonably would doubt her impartiality. The purpose of the pretrial conference was to effectuate a settlement before trial and Judge Keegan simply offered her advice as to the plaintiff's prospects of receiving a favorable verdict after trial. Furthermore, we note, as the trial court did, the allegation that Judge Keegan predetermined the

outcome of the case prior to trial is undermined by the fact that she denied the defendants' motion for a directed verdict. Finally, we do not draw an inference of bias from the court's exclusion of article 20, section 9, of the agreement from evidence. The plaintiff baldly asserts that this evidentiary ruling is evidence of bias without any factual support and we already have concluded that the exclusion of the agreement from evidence was not improper. We, therefore, conclude that the court properly denied the plaintiff's motion for a new trial concerning the plaintiff's claim that Judge Keegan should have recused herself from presiding over the jury trial.

The judgment is affirmed.

In this opinion the other judges concurred.